_____

No. 95-3175
_____

United States of America,          *
                                   *
        Plaintiff-Appellee,        *   Appeal from the United States
                                   *   District Court for the
    v.                             *   District of Nebraska.
                                   *
Cleophus Davis, Jr.,               *
                                   *
        Defendant-Appellant.       *


                         _____

              Submitted:  March 12, 1996

                 Filed:  December 23, 1996
                         _____

Before McMILLIAN, BEAM, and HANSEN, Circuit Judges.
                         _____

HANSEN, Circuit Judge.

    Cleophus Davis, Jr., was convicted by a jury of three counts
of armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d)
(1988); and three counts of using a firearm during and in relation
to a crime of violence, in violation of 18 U.S.C. § 924(c)(1) (1988
Supp. V).[1]  Davis appeals his convictions and sentence, claiming
numerous points of error by the district court.[2]  We affirm.

_____

        [1]The district court severed a seventh count of using a
dangerous and deadly weapon to forcibly assault a federal officer
in violation of 18 U.S.C. § 111(b).  The government subsequently
dismissed this count.

        [2]The Honorable Thomas M. Shanahan, United States District
Judge for the District of Nebraska.

## I. Background

This case involves the armed robbery of three separate, federally insured financial institutions in Omaha, Nebraska. Two of the armed robberies occurred only minutes apart on January 29, 1994. The third took place on March 12, 1994. Cleophus Davis was arrested and charged with all three robberies. We recite the facts in the light most favorable to the verdict.

The first robbery occurred at approximately 9:15 a.m. on January 29, 1994. An individual of medium build wearing dark sweatpants, a dark stocking cap ski mask, white tennis shoes, and white gloves entered the Mid City Bank located at the 74th Street Plaza, armed with a dark-colored, short-barrelled gun. With the gun aimed at the teller, the suspect demanded money, and at some point during the robbery, he fired a shot but no one was injured. The robber fled with $1,511.

No witnesses at the 74th Street Mid City Bank saw the robber's face because of the ski mask, but Ethel Griffin had been in her car in the plaza parking lot where the Mid City Bank is located. While she stated she could not identify the individual, she had noticed an African-American male as described above enter the bank. After hearing gunfire, she saw the same man leave the bank with a ski mask over his face and a yellow bag in his hand. The man ran by Ms. Griffin and turned north into a walkway that leads to another parking lot. Authorities discovered fresh footprints in the snow heading through the walkway toward the parking lot. The footprints measured approximately 11 inches long. Authorities also recovered a bullet fragment from the scene and later determined it to be a .38 caliber lead bullet with markings consistent with being fired from a gun with a very worn or heavily leaded barrel.

Minutes later, at approximately 9:20 a.m., an individual with a ski mask over his face entered the Streamliner Credit Union at

210 North 78th Street and demanded money from the teller.  (There was testimony that it takes three to five minutes to travel by car to this location from the Mid City Bank on 74th Street.)  With a gun aimed at the teller, he said, "Fifties and hundreds, b****, fifties and hundreds."  (Trial Tr. at 415.)  Teller Susan Grow testified that the robber was an African-American male -- she could see his skin through the ski mask eye holes.  She estimated that he was approximately 5'5'' to 5'8'' tall and weighed approximately 140 pounds.    Another  employee  testified  that  the  robber  was approximately 5'7'' or 5'8'' tall with a thin build.  The robber fled with $4,945.

Again, fresh shoe prints were found in the snow along the path where the robber fled.  The police photographed the prints.  An Omaha police senior crime laboratory technician testified that the prints found near the Streamliner Credit Union were similar to those found near the scene of the first robbery at the 74th Street Mid City Bank.

Less than two months later, on March 12, 1994, an armed robbery took place at the Mid City Bank at 304 South 42nd Street in Omaha.  Shortly after 11 a.m., bank teller Rita Kuchcinski heard a loud popping noise.  She looked up to see an African-American male in a dark-colored stocking cap with a white scarf around his neck and a dark-colored gun in his right hand.  The robber pointed the gun at Ms. Kuchcinski's head and repeatedly demanded, "Give me all your hundreds and fifties."  (Trial Tr. at 675.)  He also said, "Come on, b**** . . . There's got to be more."  (Id. at 676, 677).  The vice president of the bank, Kenneth Grigsby, came out of his office upon hearing the loud noise.  He saw an African-American male as described above leaning into Ms. Kuchcinski's teller booth and brandishing a dark-colored revolver.  He estimated that the robber stood 5'6'' to 5'7'' tall and weighed 140 to 150 pounds. The individual fled with $2,400.

Around the time of this robbery, John Coats was in his car at a stoplight on the intersection of 42nd Street and Farnum, near the 42nd Street Mid City Bank. Mr. Coats noticed an African-American male jogging toward him from the direction of the bank, crossing the street against the light. Mr. Coats watched as the man approached and ran past Coats' automobile. The man had something white, like a towel, wrapped around his neck that blew off as he ran, but he did not attempt to stop it or retrieve it. This behavior caught Mr. Coats' attention, and he continued to watch in his rearview mirror until he could no longer see the man. Mr. Coats testified that at the time, he wondered what was happening because he knew "that bank gets held up a lot." (Trial Tr. at 622.) Mr. Coats described the man he saw as having an angular face and estimated him to be in his mid- to late-20s, between 5'7'' and 5'10'' tall, weighing around 165 pounds.

After learning that the bank had been robbed on the morning when he had observed this unusual behavior, Mr. Coats reported to the FBI what he had seen. He, along with the bank teller from the 42nd Street Mid City Bank, Ms. Kuchcinski, provided information for an FBI artist to sketch a likeness of the suspect. Both described an individual with an angular face, but neither witness was satisfied with the sketch. These two witnesses also participated in a police identification lineup. Out of a lineup of four individuals, Mr. Coats identified Davis, noting a "strong probability" or an "80 to 90 percent probability" of being the person he saw after the robbery. (Trial Tr. at 632, 654.) Ms. Kuchcinski could not decide between Davis and one other person in the physical lineup, but she was able to identify Davis through a voice identification procedure where she listened to four individuals say the phrase, "Give me all your fifties and hundreds" -- a phrase the robber had repeatedly said to Kuchcinski.

The evidence also shows that a few days before the first armed robberies on January 29, the Omaha police impounded a 1978 Lincoln

4

Continental automobile that was registered to Davis's girlfriend, Jessica Carr (now his wife). On the very morning of the first two robberies between 10:00 and 11:30 a.m., Davis and Carr went to a used car dealer and indicated that they wanted to purchase a 1985 Nissan 300ZX. They paid $2,600 cash and registered it under Carr's name. Davis indicated to the dealer that he had recently received the money from a tax refund. The government presented evidence to demonstrate that neither Davis nor Carr had received any such refund. In fact, Davis was not employed, he was making his living "hustling" (Trial Tr. at 1074), and the IRS had no records of Davis filing any income tax documents from 1990 through 1993. The evidence also indicated that although the Nissan 300ZX was registered to Carr, Davis drove it and took care of it.

When he was arrested, Davis was wearing shoes that measured 11 inches long, and a partial box of .38 caliber wadcutter cartridges was found in plain view in the Nissan 300ZX. Davis was 25 years old, stood approximately 5'8'' tall, and weighed approximately 140 pounds. Davis denied any involvement in the bank robberies or in the purchase of the Nissan.

The .38 caliber wadcutter cartridges found in a box in the Nissan were later tested against the bullets found at the crime scenes. The crime scene bullets bore markings similar to each other, indicating that they were possibly fired by the same gun. The bullets from the box found in the Nissan were determined to be analytically indistinguishable from the bullets recovered at the 74th Street Mid City Bank and the 42nd Street Mid City Bank. An expert testified that such a finding is rare and that the bullets must have come from the same box or from another box that would have been made by the same company on the same day.

Two FBI agents later searched the Nissan 300ZX with the consent of its owner, Jessica Carr. They were looking for a gun, which they did not find. They found a receipt from some repairs

5

that had been done to the vehicle, an estimate for those repairs, and a pair of tennis shoes. After searching the car, the agents allowed Jessica Carr to take some personal items out of the car. Agent Holmquist testified that she took the Nissan 300ZX owner's manual, a little white pillow, a chess or checkers box, and some other personal items. She then asked for a box to carry the items in, and the agents found a brown cardboard box to give her.

In late June 1994, upon belief that evidence of the robbery was located in Shauna Copeland's apartment, where Jessica Carr had been staying, FBI agents obtained and executed a search warrant for that apartment. Authorities searched Copeland's apartment and found a brown cardboard box that Ms. Carr was storing there. Agent Holmquist of the FBI testified that the box looked like the one he had given Carr to carry the personal items she had retrieved from the Nissan. Within the box, agents found the Nissan owner's manual, a little white pillow, a chess set, a picture of Cleophus Davis, an invoice with Davis's name on it, and a .38 caliber snub nosed revolver. The FBI later tested the gun and found it to have a very worn, heavily leaded barrel, consistent with the markings on the bullets recovered from the crime scenes. An expert witness opined that it is possible that the bullets recovered from the 74th Street Mid City Bank and the 42nd Street Mid City Bank were fired from this weapon.

Davis was charged in a superseding indictment with three counts of armed robbery and three counts of use of a firearm in connection with a crime of violence. A jury convicted Davis of all six counts, and the district court sentenced him to a total term of 670 months of imprisonment. Davis appeals.

## II. Sufficiency of the Evidence

Davis first challenges the sufficiency of the evidence to sustain his convictions. The district court denied his motion for

acquittal and his motion for a new trial.  Davis argues that the district court erred in denying his motions because the evidence in this case is as equally strong to infer innocence as it is to infer guilt.  We disagree.

We review the denial of a motion for acquittal by viewing the evidence in the light most favorable to the verdict, giving the government the benefit of all reasonable inferences to be drawn from the evidence.  United States v. French, 88 F.3d 686, 687-88 (8th Cir. 1996); United States v. Teitloff, 55 F.3d 391, 393 (8th Cir. 1995).  We will uphold the conviction against a challenge to the sufficiency of the evidence unless "a reasonable factfinder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements."  Id. (internal quotations omitted).  See Jackson v. Virginia, 443 U.S. 307, 317 (1979).  This standard applies even when the conviction rests entirely on circumstantial evidence.  United States v. Wilcox, 50 F.3d 600, 602-03 (8th Cir. 1995).

"[W]here the government's evidence is equally strong to infer innocence as to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal."  United States v. Kelton, 446 F.2d 669, 671 (8th Cir. 1971).  In determining the strength of the evidence in a circumstantial case, "it is the totality of the circumstances that must be weighed in making a decision on a motion for acquittal."  United States v. Kelton, 519 F.2d 366, 367 (8th Cir.), cert. denied, 423 U.S. 932 (1975).

We conclude that the government presented a substantial amount of circumstantial evidence from which the jury could reasonably find (beyond a reasonable doubt) that Davis committed all three robberies.  To summarize, the two eye witnesses to the last robbery (at the 42nd Street Mid City Bank) identified Davis out of court.  Mr. Coats, who had seen the robber run across the street, identified Davis in a lineup, and Ms. Kuchcinski, the teller from

7

whom the robber had demanded money, narrowed the physical lineup to Davis and one other and then identified Davis's voice in a voice identification procedure. Although no eyewitnesses saw the suspect's face at the first two robbery scenes, Davis can also be logically linked to them from the evidence at the last robbery scene. Davis's physical characteristics fit the general descriptions given by all the witnesses at all the crime scenes. His choice of words when demanding money at the last robbery was very similar to his choice of words at the Streamliner Bank (the second robbery). The shoes he wore when arrested were the same length as the footprints in the snow where the suspect fled from the first two robberies.

Additionally, expert testimony demonstrated a high probability that the bullets spent at the first robbery and the last robbery originated from the same box of cartridges. They can be linked to Davis because they are analytically indistinguishable from the partial box of cartridges found in the Nissan that Davis and Carr purchased, a very rare finding. When told that a box of .38 caliber wadcutter cartridges had been found in the Nissan 300ZX, would be evaluated, and would be compared with the bullets found at the robbery scenes, Davis looked at the interviewing officer, smiled and said, "You don't have a gun, do you?" (Trial Tr. at 1076.) Davis then asked if any fingerprints had been found at the banks; he told the officer, "Bring me some fingerprints and we'll talk." (Id.) The .38 caliber snub-nosed gun, found in the possessions that were clearly linked to the defendant, had a heavily leaded and worn barrel, which is consistent with the markings on the bullets found at both the first and last crime scenes.

The government also introduced evidence of motive very close in time to the crimes. The car Davis drove was repossessed a few days before the first robberies, and Davis used a large sum of cash to purchase the Nissan 300ZX on the very day of the first two

8

robberies -- a time when the defendant had no job or legitimate source of income. Further, Davis lied to the car salesman about the source of the cash.

After reviewing the entire record, we are satisfied that the evidence in this case, "although circumstantial, is not equivocal on its face," and was therefore properly submitted to the jury. Kelton, 519 F.2d at 367. Viewing the totality of the evidence in the light most favorable to the verdict, the evidence is sufficient for the jury to have found guilt on all of the counts beyond a reasonable doubt. Davis points to conflicts that existed in the evidence in an attempt to discredit the verdict. This attempt fails, because regardless of the conflicts, our review only considers the reasonable inferences that may be drawn when the evidence is viewed in the light most favorable to the verdict. The jury was responsible for resolving conflicts in the evidence. The district court did not err by denying Davis's motion for judgment of acquittal.

Davis also contends that the district court abused its discretion by denying his motion for a new trial, arguing that the verdict is contrary to the great weight of the evidence. In assessing whether the defendant is entitled to a new trial on this basis, the district court weighs the evidence and evaluates anew the credibility of the witnesses to determine if a miscarriage of justice may have occurred. United States v. Rodriquez, 812 F.2d 414, 417 (8th Cir. 1987); United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980). We review the district court's denial of a new trial on this ground for "a clear and manifest abuse of discretion." Rodriquez, 812 F.2d at 417. Having carefully reviewed the record, we cannot say that the district court committed a clear and manifest abuse of discretion by denying Davis's motion for a new trial.

9

## III. Theory of Defense

Davis contends that the district court erred by failing to incorporate into the jury instructions his suggested instruction on his theory of defense -- misidentification.[3]  A defendant is

_____

[3]Davis proposed the following theory of defense instruction:

> Cleophus Davis has pleaded not guilty to the charges made in counts I - VI of the Indictment.  Davis' plea of not guilty puts in issue each of the essential elements of the offenses charged and imposes upon the government the burden of proving each of the essential elements of those charges beyond a reasonable doubt.

> Cleophus Davis contends that he is not guilty because he has been mistakenly identified as the perpetrator.  Accordingly, the following must be noted:

> First, Davis should not be prejudiced by the fact that neither the government nor himself identified who the actual perpetrator was.

> Second, you are free to consider and weigh the effect of the government's failure to adduce any direct evidence against Davis that proved that Davis was the person who actually committed the robberies.

> Third, as a general rule the law makes no distinction between direct and circumstantial evidence, but simply requires that you be satisfied of the defendant's guilt beyond a reasonable doubt before convicting him.  In considering circumstantial evidence, keep certain things in mind.  The circumstances must be proved beyond a reasonable doubt.  These circumstance[s] should be consistent with guilt and inconsistent with innocence.  They ought to be of such a conclusive or positive tendency as to convince you of guilt beyond a reasonable doubt than of some other conclusion.  Therefore, if the circumstances are susceptible of two equally reasonable constructions -- one indicating guilt and the other innocence -- then, of course, you should find the defendant innocent.

(Appellant's Addend. at 14-15.)

10

entitled to an instruction on his theory of defense if the defendant makes a proper request, if there is evidence to support the instruction, and if the instruction contains a correct statement of the law. United States v. Gonzales, 90 F.3d 1363, 1371 (8th Cir. 1996); United States v. Long Crow, 37 F.3d 1319, 1323 (8th Cir. 1994), cert. denied, 115 S. Ct. 1167 (1995). We review for an abuse of discretion the district court's refusal to give a particularly worded "theory of defense" instruction, Gonzales, 90 F.3d at 1371, but we review de novo the question of whether there is sufficient evidence to submit an affirmative theory of defense, Long Crow, 37 F.3d at 1323.

In this case, while the district court rejected Davis's particularly worded theory of defense instruction, it did not reject as unsupported by the evidence his defense of misidentification. Instead, the district court adopted Davis's instruction in part, incorporating the claim of mistaken identity into an existing instruction that set forth the presumption of innocence and the government's burden of proof. (See Supp. R. at 43; Jury Instr. 4.) To Instruction 4, the district court added the following: "Also, Cleophus Davis contends that he is not guilty because he has been mistakenly identified as the perpetrator of the offenses stated in the Superseding Indictment." (Id.) We conclude that the inclusion of this paragraph sufficiently instructed the jury on Davis's misidentification theory of defense.

The district court rejected the remainder of Davis's proposed instruction, which explained circumstantial evidence and reasonable doubt. The contents of the remainder of Davis's proposed instruction were cumulative of material already covered in other parts of the existing jury instructions. Instruction 6 adequately explained the reasonable doubt standard, and Instruction 7 adequately directed the jury to consider the reasonable inferences arising from the evidence and informed them that the law makes no

11

distinction between circumstantial and direct evidence. (See Supp. R. at 45-46.)

Davis specifically argues, however, that nowhere did the court's jury instructions state that the jury must find the defendant not guilty if the circumstantial evidence was equally susceptible to guilt as to innocence. This argument, in essence, is based on nothing more than a particular wording of the government's burden of proof, which is guilt beyond a reasonable doubt.

> [S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury."

Victor v. Nebraska, 511 U.S. 1, 5 (1994) (alterations in original). We have specifically and repeatedly approved the reasonable doubt instruction given by the district court in this case[4] "as an accurate statement of the requisite burden of proof." United States v. Rogers, 91 F.3d 53, 56 (8th Cir. 1996). Accordingly, we hold that the district court did not abuse its discretion by refusing to adopt the defendant's particularly worded jury instruction.

---

[4]Jury Instruction 6 stated as follows:

> A reasonable doubt is a doubt based upon reason and common sense, and not the mere possibility of innocence. A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it. However, proof beyond a reasonable doubt does not mean proof beyond all possible doubt.

(Supp. R. at 45.)

12

The standard offered by the defendant is the legal standard used by district courts to determine whether the case should be submitted to the jury. See Kelton, 446 F.2d at 671. While an instruction on this standard has been approved where the overall instructions properly placed the burden on the government to prove every element of the crime beyond a reasonable doubt, see United States v. Vaglica, 720 F.2d 388, 391 (5th Cir. 1983), it in fact has also been condemned "because standing alone, [the] language may mislead a jury into thinking that the government's burden is somehow less than proof beyond a reasonable doubt," United States v. Attanasio, 870 F.2d 809, 818 (2d Cir. 1989) (internal quotations omitted). We see no reason to transform the standard by which a motion for judgment of acquittal is tested into a required jury instruction. Additionally, the lack of a particularly worded instruction did not prevent Davis's attorney from vigorously arguing to the jury the standard that he offered in his proposed instruction. (See Trial Tr. at 1418, 1435.)

## IV. Identification Procedures

Davis contends that the district court erred by refusing to suppress the in-court identification by John Coats, the witness who observed the robber from his car while waiting at a stoplight near the last robbery scene. Because this claim implicates Davis's right to constitutional procedural due process, we review this question de novo. United States v. Johnson, 56 F.3d 947, 953 (8th Cir. 1995).

"Reliability is the linchpin in determining the admissibility of identification testimony . . . ." Manson v. Brathwaite, 432 U.S. 98, 113, 114 (1977). Identification testimony will be suppressed only if the procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968); accord Manson, 432 U.S. at 116; United States v. Rogers, 73

13

F.3d 774, 778 (8th Cir.), cert. denied, 116 S. Ct. 1889 (1996); United States v. Murdock, 928 F.2d 293, 297 (8th Cir. 1991). This determination turns upon the totality of the circumstances in each case, considering factors that "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson, 432 U.S. at 114. We must weigh the totality of these circumstances against "the corrupting effect of the suggestive identification itself" to determine whether suppression is warranted. Id.

Davis contends that Mr. Coats' in-court identification was made under an impermissibly suggestive procedure because Davis was the only African-American male seated at the defense counsel table, and the only other African-American individual present was a man in the back of the courtroom. While recognizing the potential suggestive nature of in-court identifications where an African-American defendant is seated at counsel table, we have previously rejected claims similar to the one Davis makes here, finding that although the in-court identification procedure may have been suggestive or tainted, it was not so impermissibly suggestive as to lead to a likelihood of irreparable misidentification. See Rogers, 73 F.3d at 778 (holding no due process violation where counsel attacked the reliability and credibility of the identification during cross-examination and the testimony of two other witnesses identified the defendant); Murdock, 928 F.2d at 297 (holding no due process violation where defendant did not request special seating or object to the racial composition of the courtroom, the identifications were open to attack on cross-examination, and the identifications were reliable under the totality of the circumstances). We agree with the Ninth Circuit's assessment that "[t]here is no constitutional entitlement to an in-court line-up or other particular methods of lessening the suggestiveness of in-court identification, such as seating the defendant elsewhere in

14

the room.  These are matters within the discretion of the court."
United States v. Domina, 784 F.2d 1361, 1369 (9th Cir. 1986), cert.
denied, 479 U.S. 1039 (1987).

In this case, Davis made a specific objection to the racial
composition of the courtroom and requested that he not be seated at
counsel table during the identification procedures.  The district
court denied the request, concluding that the defendant was
adequately protected by cross-examination.  The district court did
not abuse its discretion because our review of the record convinces
us that the government's questions were not suggestive, the
witness's in-court identification was vigorously attacked on cross-
examination, and more importantly, other circumstances indicate
that the witness's testimony was reliable enough to be presented to
the jury.

On the day of the crime, Mr. Coats had observed a man running
away from the direction of the 42nd Street Mid City Bank and toward
his car as he was stopped at a street light.  Mr. Coats viewed him
with a good degree of attention and continued to watch him through
the rearview mirror until he was out of sight, because of his
unusual behavior.  Within a few days after the crime, Mr. Coats
provided a detailed description of the man he saw running by his
car.  Coats also chose Davis out of a pretrial lineup, identifying
Davis with a "strong probability" or an "80 to 90 percent
probability" of being the person he saw running from the 42nd
Street Mid City bank after the robbery.  (Trial Tr. at 632, 654.)
The district court found that the lineup procedure was not
suggestive (the witnesses reviewed the lineup separately and were
advised that there was no obligation to choose anyone), and Davis
does not challenge the reliability of the lineup in this appeal.
Rita Kuchcinski, another eye witness, also identified Davis through
out-of-court procedures that were determined not to be suggestive
in any way.  Thus, this case did not rest solely on the reliability
of Mr. Coats' in-court identification, and given the total

15

circumstances, the arguably suggestive nature of the in-court identification was not so impermissibly suggestive as to create "a very substantial likelihood of irreparable misidentification." Simmons, 390 U.S. at 384. "We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." Manson, 432 U.S. at 116.

Davis also challenges the voice identification procedure. Rita Kuchcinski, the bank teller at the 42nd Street Mid City Bank, participated in both the physical lineup and voice identification procedures. During the lineup, she could not decide between two individuals -- Davis and one other person -- but she did identify Davis by his voice. The voice identification procedure consisted of requiring four individuals to repeat the phrase that the robber had repeatedly yelled at Kuchcinski: Give me all your hundreds and fifties. Kuchcinski was not allowed to see the individuals as they spoke. Kuchcinski identified Davis's voice and testified that she was quite sure that her identification was accurate.

Davis contends that Kuchcinski could not have had sufficient opportunity to listen to the robber's voice at the time of the crime, because the robber made only one statement to her. This argument is not factually accurate according to our reading of the record, and in any event, it puts the cart before the horse. Through this argument, Davis attempts to demonstrate a likelihood of irreparable misidentification without first demonstrating that the voice identification procedure itself was in any way suggestive. An irreparable likelihood of misidentification does not arise through the circumstances of the crime alone but arises upon the government's use of suggestive identification procedures when combined with the specific circumstances of the crime. Absent an impermissibly suggestive identification procedure, there can be

16

no due process violation.  Accordingly, we find this claim to be without merit.

## V.  Evidentiary Issues

Davis contends that the district court erred by denying his motion to suppress evidence seized at Shauna Copeland's apartment. "In reviewing the grant or denial of a motion to suppress evidence on Fourth Amendment grounds, we are bound by the district court's findings of fact regarding the circumstances of the search unless we believe on the basis of the record as a whole that the district court clearly erred."  United States v. Riedesel, 987 F.2d 1383, 1387 (8th Cir. 1993).  Clear error occurs when the decision is not supported by substantial evidence, reflects an erroneous view of the applicable law, or leaves us with a definite and firm conviction that a mistake has been made.  Teitloff, 55 F.3d at 393. "We may reverse the district court's ultimate ruling on the suppression motion, however, if the ruling reflects an erroneous view of the applicable law."  Riedesel, 987 F.2d at 1388.  This amounts to a de novo review of the ultimate decision of a district court to deny a motion to suppress.  United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994).

"Fourth Amendment rights are personal and may not be asserted vicariously . . . ."  Id. (citing Rakas v. Illinois, 439 U.S. 128, 138-44 (1978)).  Consequently, the defendant must demonstrate "a legitimate expectation of privacy in the area searched or the item seized."  Id.  In this case, Davis failed to demonstrate either. The apartment searched was the residence of Shauna Copeland.  Davis does not contend that he lived at this address or that he was a guest in the home at the time of the search.  See Minnesota v. Olson, 495 U.S. 91, 95-100 (1990) (holding overnight guest had a legitimate expectation of privacy in the host's home). Furthermore, Davis does not claim ownership of the box, which Jessica Carr was storing at this address.  Absent a legitimate

17

expectation of privacy in Shauna Copeland's apartment or in the box, the search and seizure did not violate Davis's Fourth Amendment rights.

Davis also contends the district court erred by admitting irrelevant and prejudicial evidence -- namely, information about his failure to file income tax returns, information about the purchase of the Nissan 300ZX, a bullet recovered from a parking lot during surveillance of Davis's residence, and testimony concerning two guns. "We review [the] district court's ruling on admissibility of evidence for an abuse of discretion," United States v. Mendoza, 85 F.3d 1347, 1351 (8th Cir. 1996), discussing each piece of evidence in turn.

Davis argues that the income tax information was not relevant within the meaning of Federal Rules of Evidence 401 and 402, and to the extent the tax information was relevant at all, its relevance was outweighed by its prejudicial effect. See Fed. R. Evid. 403. Also, Davis contends that the tax information violated Federal Rule of Evidence 404(b). Contrary to Davis's assertions, the information that Davis had not filed income tax returns for the preceding two years was relevant to a material issue of fact at trial, its prejudicial effect did not outweigh that probative value, and it was not offered to show bad character. "Rule 404(b) only forbids introduction of extrinsic bad acts whose only relevance is to prove character, not bad acts that form the factual setting of the crime in issue." United States v. Williams, 95 F.3d 723, 731 (8th Cir. 1996). The tax evidence was relevant to the factual issues of this case because it demonstrated Davis's lack of a legitimate source of income at the time he and Carr purchased the Nissan 300ZX with cash and refuted the explanation he gave the car dealer concerning the source of the cash. See United States v. Vannerson, 786 F.2d 221, 224 (6th Cir.) (holding robber's failure to file income taxes was relevant to demonstrate his pre-theft income and to negate defendant's claim that he received income from

18

playing in bands), cert. denied, 476 U.S. 1123 (1986). Furthermore, the prejudicial effect of this evidence did not outweigh its probative value.

Similarly, the testimony concerning the purchase of the Nissan 300ZX was relevant to material factual issues and was not unfairly prejudicial. The purchase of this automobile and expenditures made for its maintenance explained what may have happened to the proceeds from the bank robberies. Davis's involvement in the purchase and maintenance of the Nissan 300ZX, in which incriminating evidence was found, helped link Davis to that evidence and to the crimes at issue.

Davis contests the admission of a .38 caliber shell found in the parking lot near his apartment, arguing that it did not make it more probable that he committed the robberies. To the contrary, this evidence was relevant to Davis's use of a .38 caliber gun, and expert testimony linked this particular shell to the box of cartridges found in the Nissan. Expert testimony also linked that box of cartridges to the bullets recovered from the crime scenes.

Likewise, the testimony concerning the .38 caliber guns was relevant. From examining the bullets recovered from the crime scenes, an expert was able to conclude that the gun that shot these bullets had a very worn and heavily leaded barrel. The first gun tested, which was linked to a different suspect, was eliminated from the investigation because it did not have a worn and heavily leaded barrel that could have made the marks found on the bullets at the robbery scenes. The .38 caliber gun found in the box of personal items linked to Davis that Jessica Carr was storing at Shauna Copeland's apartment, on the other hand, matched the physical descriptions of the gun used during the crimes and had a very dirty barrel with heavy lead deposits, which could have produced the marks on the bullets found at the crime scenes. The testimony concerning these guns bears obvious relevance to the

19

crimes charged because it permits the inference that the gun found in the box of items linked to Davis was in fact the gun used during the robberies.  Again, the probative value of the evidence was not outweighed by its prejudicial effect.  We find no abuse of discretion in the district court's evidentiary rulings.

## VI.  Scientific Evidence

The Federal Rules of Evidence provide that expert scientific testimony is admissible pursuant to Rule 702 if the district court first concludes, pursuant to Rule 104(a), "that the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993); accord United States v. Martinez, 3 F.3d 1191, 1196 (8th Cir. 1993), cert. denied, 510 U.S. 1062 (1994).  The Supreme Court has emphasized that Rule 702 envisions a flexible inquiry:  "Its overarching subject is the scientific validity -- and thus the evidentiary relevance and reliability -- of the principles that underlie a proposed submission.  The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  Daubert, 509 U.S. at 594-95.  Relevant, but not exclusive, concerns when assessing the reliability of the evidence include (1) whether the theory or technique can or has been tested, (2) whether it has been subjected to peer review and publication, (3) the known or potential rate of error of the technique, and (4) general acceptance among the scientific community.  Id. at 593-94; United States v. Kime, 99 F.3d 870, 883 (8th Cir. 1996); United States v. Reynolds, 77 F.3d 253, 254 n.1 (8th Cir. 1996).  We review for an abuse of discretion the district court's decision regarding the admissibility of scientific evidence.  See Johnson, 56 F.3d at 952.

The district court held a preliminary evidentiary hearing to determine the admissibility of the expert testimony proffered by

20

the government on Inductively Coupled Plasma-Atomic Emission Spectrometry (ICP), a process used in this case to analyze and compare trace elements found in the bullet fragments. The government presented the testimony of John Riley, special agent of the FBI, who specializes in the analysis of various materials for their elemental and trace elemental composition. Mr. Riley has been doing this work for approximately 27 years. He has a bachelor of science degree in chemistry and a master of science degree in forensic science. He has also authored articles and lectured on this subject.

Mr. Riley testified that ICP, an analysis that the FBI has been using for approximately 10 years, is a generally accepted scientific technique that has been subjected to testing, publication, and peer review, and the technique is the same no matter who performs it. Another procedure used to accomplish the same basic analysis is neuron activation analysis. The FBI has been using the neuron activation analysis since the mid-1960s but now favors ICP for trace elemental analysis because ICP is more sensitive. ICP can determine trace elements down to parts per million (.0000001 percent). The procedure determines which of five trace elements are present in the bullets to be compared. If the same elements are present in each, then the procedure determines the percentage of each element present. If the same elements are present in the same amounts then they are analytically indistinguishable.

Mr. Riley testified that research has been conducted on the composition and comparison of bullets manufactured at the same plant on either the same or different days and at different plants. The research revealed that while 400,000 bullets could be produced at a factory in one day, the composition of those bullets will vary vastly unless they were manufactured side by side, because lead is a heavy molten metal that cannot be mixed into a completely homogenous mixture throughout; pockets of different elemental

21

compositions will exist and additional lead of differing elemental compositions is periodically added to the cauldron throughout a day, changing the elemental composition of the bullets produced. Based on this research and the results of the trace elemental composition ICP analysis, the expert concluded that the bullets at issue were analytically indistinguishable from some of the bullets in the box of cartridges found in the Nissan, that they were generally similar to the remaining bullets in that box, and that there was a high correlation between the two bullets found at the crime scenes. He also concluded that these bullets must have been manufactured at the same Remington factory, must have come from the same batch of lead, must have been packaged on or about the same day, and could have come from the same box.

Defense counsel attacked the information by reading one paragraph from a book (see Trial Tr. at 838), which criticized neuron activation analysis (ICP was the analysis used here), because there is no way of knowing exactly how many bullets manufactured by the same company have this same elemental composition. The expert in this case admitted having no way of knowing how many other bullets Remington produced on the same day as these that also would have a composition that is analytically indistinguishable from the bullets tested here.

At the end of this hearing, the court determined that there was a sufficient scientific basis to admit the expert's testimony. The court concluded that the book criticizing this use of the evidence goes to weight and credibility, not the scientific basis of the evidence. Davis does not attempt to demonstrate that ICP is not a scientifically valid technique for determining the trace elemental composition of bullets, or does he attempt to demonstrate that Agent Riley improperly performed the technique. Instead, he challenges the conclusion that because the bullets are analytically indistinguishable from those found in Davis's cartridge box, they

22

must have come from that box.  He also argues that the evidence was more prejudicial than probative for this reason.

We conclude that the district court fully executed its gatekeeping function, see Martinez, 3 F.3d at 1196, and did not abuse its discretion by admitting the expert testimony.  The evidence made it more probable than not that the expended bullets originated from the cartridge box found in the Nissan.  Davis was free to challenge the expert's conclusions and point out the weaknesses of the analysis to the jury during cross-examination.  Weight and credibility are the province of the jury.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

## VII.  Indictment Defects

Davis contends that the district court erred by not dismissing the superseding indictment because of an irregularity consisting of a "re-vote" in the Grand Jury proceedings.  Federal Rule of Criminal Procedure 12(b)(2) requires defendants to raise defenses and objections based on the indictment prior to trial, and a failure to do so constitutes a waiver, Fed. R. Crim. P. 12(f). United States v. Prescott, 42 F.3d 1165, 1167 (8th Cir. 1994). Prior to trial, Davis filed a motion to disclose the grand jury minutes in order to search for irregularities in the proceedings. A magistrate judge reviewed the transcripts of the grand jury proceedings, found no irregularities, and denied the defendant's motion to review the transcripts, describing the request as a fishing expedition.  Davis made no objection to the district court regarding this order and did not move to dismiss the superseding indictment on the basis of an irregularity.  Accordingly, we will not entertain the issue.  Any alleged defects in the indictment have been waived.

23

Davis also contends that the superseding indictment contained a fatal jurisdictional defect that the government failed either to amend or prove. Count V charged Davis with armed robbery, in violation of 18 U.S.C. § 2113(a) and (d), of the 42nd Street Mid City Bank. The indictment stated that the 42nd Street Mid City Bank was insured by the National Credit Union Administration. In fact, however, the 42nd Street Mid City Bank was insured by the Federal Deposit Insurance Corporation (FDIC), and the government's evidence at trial proved that the bank was insured by the FDIC. Davis moved to dismiss or acquit on count V at the close of the government's evidence on the ground that the government failed to prove what it alleged in the indictment, but he did not renew that motion at the close of trial before deliberation and did not argue it in his motion for new trial. Further, Jury Instruction 14 required the jury to find that the 42nd Street Mid City Bank was insured by the FDIC, which is in accord with § 2113(f), and the record reveals no objection to the final form of Jury Instruction 14. The jury convicted Davis on this count.

> Although the sufficiency of the indictment is a jurisdictional issue that may be raised at any time, an indictment that is challenged after jeopardy has attached will be liberally construed in favor of sufficiency. The indictment will then be upheld unless it is so defective that by no reasonable construction can it be said to charge the offense for which the defendants were convicted.

United States v. Just, 74 F.3d 902, 904 (8th Cir. 1996).

Section 2113 makes it a crime to engage in armed robbery of "any bank, credit union, or any savings and loan association." 18 U.S.C. § 2113(a). Section 2113 separately defines "bank," as "any member bank of the Federal Reserve System, and any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States . . . and any institution the deposits of which are insured

24

by the Federal Deposit Insurance Corporation." Id. § 2113(f). Section 2113 also separately defines "credit union" as a "credit union the accounts of which are insured by the National Credit Union Administration Board." Id. § 2113(g). Davis argues that because these are separate jurisdictional elements, the government's recital of the wrong federal insuring agency in the indictment is fatal. See United States v. Mize, 756 F.2d 353 (5th Cir. 1985) (holding that reversal is required when a federal criminal statute has more than one separately defined basis of jurisdiction and the jurisdictional element stated in the indictment is constructively modified at trial); see also United States v. Fitzpatrick, 581 F.2d 1221 (5th Cir. 1978) (holding § 2113 states three alternative bases for federal jurisdiction for robbery of a savings and loan institution, and a fatal defect occurred where indictment charged that the institution was federally insured while the court charged the jury on an alternate statutory basis for federal jurisdiction -- the presence of a federal charter).

"As a general rule, an indictment is sufficient if it first, contains the elements of the charged offense and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead double jeopardy as a bar to future prosecution." United States v. Just, 74 F.3d at 903-04 (internal quotations omitted). It has long been the rule that "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." Stirone v. United States, 361 U.S. 212, 215-16 (1960). To convict a defendant on a charge not made against him in the indictment is fatal error that requires reversal. Id. at 219. A mere variance between the indictment and the proof, however, which "occurs when the charging terms are left unaltered but the evidence offered at trial proves facts different from those alleged in the indictment," does not require reversal of a conviction unless the variance results in

25

actual prejudice.  <u>United States v. Koen</u>, 31 F.3d 722, 724 (8th Cir. 1994), <u>cert.</u> <u>denied</u>, 115 S. Ct. 908 (1995).

We conclude that what occurred in the present case was not a jurisdictional defect but a mere variance between the indictment and the proof, which was not prejudicial to the defendant and therefore is not fatal to his conviction.  "The federally insured status of a bank is an essential element that must be proved to sustain a conviction under 18 U.S.C. § 2113(a) and (d)."  <u>United States v. Mays</u>, 822 F.2d 793, 795 (8th Cir. 1987).  This essential element was present in the indictment, as the face of the indictment clearly indicates that the bank was federally insured in spite of the fact that the federal insurer was misnamed.  This misnomer did not broaden the charges against Davis, and the indictment was sufficiently clear to enable him to plead double jeopardy to a future prosecution for the same offense. <u>See</u> <u>Just</u>, 74 F.3d at 903-04.  The indictment informed Davis of the nature of the offense charged, the statutory violations involved and that a federal agency insured the funds of the bank.[5]  <u>See</u> <u>United States v. Janoe</u>, 720 F.2d 1156, 1159 (10th Cir. 1983) (holding an indictment for robbery was sufficient where the indictment incorrectly named the FDIC as the federal insurer instead of the Federal Savings and Loan Insurance Corporation), <u>cert.</u> <u>denied</u>, 465 U.S. 1036 (1984). We agree with the Tenth Circuit that "[o]nly the failure to mention <u>any</u> federal insuring agency constitutes a fatal defect in an indictment."  <u>Id.</u>  Inadvertently naming the wrong federal insuring agency does not deprive the court of jurisdiction as long as the proof conformed to the statutory elements. <u>Cf.</u> <u>United States v. Roberts</u>, 859 F.2d 593, 594 (8th Cir. 1988) (holding no jurisdictional error where indictment and proof indicated the institution was insured by the Savings and Loan

---

[5]Additionally, we note that in count I, the indictment correctly named the FDIC as insurer of the Mid City Bank on 74th Street -- the sister bank of the 42nd Street Mid City Bank.

26

Insurance Corporation, but the jury instructions mistakenly charged that the deposits were insured by the FDIC), cert. denied, 489 U.S. 1059 (1989).  In this case, the proof placed in evidence satisfied all of the elements of the statute referenced in the indictment and did not result in any prejudice to the defendant.

## VIII.  Severance

Davis filed a motion to sever, seeking a separate trial of the counts relating to the March 1994 robbery.  The district court denied the motion and tried all counts of the indictment together. Davis contends that the district court abused its discretion.

First, we observe that the counts were properly joined in one indictment.  Two or more offenses may be charged in the same indictment as long as the offenses charged "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."  Fed. R. Crim. P. 8.  Joinder, then, is "proper when `the two counts refer to the same type of offenses occurring over a relatively short period of time, and the evidence as to each count overlaps.'"  United States v. Robaina, 39 F.3d 858, 861 (8th Cir. 1994) (quoting United States v. Shearer, 606 F.2d 819, 820 (8th Cir. 1979)).  We review de novo the decision to join counts into a single indictment.  Id. (citing United States v. Lane, 474 U.S. 438, 449 n.12 (1986)).  The offenses charged relating to each bank robbery are the same -- armed robbery and use of a firearm in relation to a crime of violence.  The proof for each count is overlapping and intertwined.  Two of the robberies were committed on the same day, and the other was committed less than two months after the first two.  We have affirmed the joinder of offenses when the time periods between them have spanned six months or greater.  See id.  The offenses charged in Davis's indictment were all properly joined.

27

The rule governing severance provides that once offenses have been properly joined, the district court may nonetheless order separate trials of the counts "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses." Fed. R. Crim. P. 14. "The decision to sever is within the sound discretion of the trial judge and the denial of a motion to sever is not subject to reversal absent a showing of real prejudice." United States v. Patterson, 20 F.3d 801, 805 (8th Cir. 1994) (internal quotations omitted). Prejudice may result from a possibility that the jury might use evidence of one crime to infer guilt on the other or that the jury might cumulate the evidence to find guilt on all crimes when it would not have found guilt if the crimes were considered separately. Closs v. Leapley, 18 F.3d 574, 578 (8th Cir. 1994). On the other hand, a defendant does not suffer any undue prejudice by a joint trial if the evidence is such that one crime would be probative and admissible at the defendant's separate trial of the other crime. Robaina, 39 F.3d at 861.

Davis contends that there was no connection between the March 1994 robbery and the January 1994 robberies, and thus there is a danger that the jury may have cumulated the evidence to infer guilt of all crimes when, if tried separately, the jury might not have found enough evidence to convict him of all counts. We disagree. Davis's theory of defense was mistaken identity. Thus, evidence of the March 1994 robbery could have been admitted at a separate trial of the two January robberies to prove identity under Rule 404(b). Accordingly, Davis suffered no real prejudice from the joinder of offenses.

## IX.  Consecutive Sentences

Finally, Davis contends that the district court abused its discretion by running his sentences consecutively. At sentencing, the district court properly treated each robbery count (counts I, III, and V) as a single count group. United States Sentencing

28

Commission, Guidelines Manual, § 3D1.2, comment. (n.7) (Nov. 1994).
The district court then correctly applied USSG § 3D1.4 to determine
a combined offense level which was then used to sentence the
defendant on each of the robbery counts to 130 months of
imprisonment to be served concurrently. See USSG Ch.3, Pt.D. For
the counts charging the use of a firearm during and in relation to
a crime of violence, in violation of 18 U.S.C. § 924(c), the
district court imposed a consecutive 60-month term of imprisonment
for count II, a 240-month term for count IV, and another 240-month
term for VI, resulting in a total consecutive sentence of 540
months of imprisonment. The express language of the statute
prohibits the district court from allowing the firearms terms of
imprisonment to run concurrently with each other or with the
underlying crime of violence. 18 U.S.C. § 924(c)(1) ("nor shall
the term of imprisonment imposed under this subsection run
concurrently with any other term of imprisonment including that
imposed for the crime of violence or drug trafficking crime in
which the firearm was used or carried"). See also USSG 2K2.4,
comment. (n.1) (acknowledging that "the statute requires a term of
imprisonment imposed under this section to run consecutively to any
other term of imprisonment"). Thus, the district court correctly
imposed consecutive sentences for the firearms offenses. We note
that the district court ordered the defendant's federal sentence to
run concurrently with the defendant's existing Nebraska state court
sentences.

## X.  Conclusion

Accordingly, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

29