# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1298

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of North Dakota. |
| Alphonzo Ervin Williams, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: February 15, 2011
Filed: July 28, 2011

_____

Before RILEY, Chief Judge, WOLLMAN, Circuit Judge, and KYLE,[1] District Judge.

_____

RILEY, Chief Judge.

In March 2009, Alphonzo Ervin Williams drove Rodney Booker, a crack cocaine and heroin dealer, from Minneapolis, Minnesota, to Fargo, North Dakota, and shared a motel room with Booker while Booker sold drugs. Booker and Williams were arrested after Booker left Williams in a car during Booker's attempt to consummate a drug deal with an undercover police officer. Booker pled guilty to

_____

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, sitting by designation.

distributing, and possessing with intent to distribute, crack cocaine and heroin.[2] Charged with various drug distribution crimes, Williams argued at trial he did not know Booker was selling drugs. A jury convicted Williams of possessing crack cocaine with the intent to distribute, of conspiring to do the same, and of conspiring in crack cocaine distribution, all in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2. The district court granted Williams's post-verdict motion for a judgment of acquittal, and alternatively for a new trial. The government appeals. We affirm in part, reverse in part, and remand for a new trial.

## I.    BACKGROUND

In early 2009, a Cass County, North Dakota, drug task force set up a series of controlled crack cocaine purchases from Booker, also known as "Godzilla." After three such purchases, Officer Allen Schmidt, an undercover police officer, expressed interest in purchasing heroin from Booker. Booker told Officer Schmidt he would contact him when he returned to Fargo. On March 18, 2009, Officer Schmidt called Booker's cell phone. Booker answered the call and told Officer Schmidt he would arrive in Fargo in 30 minutes. Williams was driving Booker's car because Booker "was sick because [he] get[s] high on drugs and things like that and [he] didn't have nobody to drive [him]." Officer Schmidt testified he tried to negotiate a drug deal with Booker during the call, but Booker was unwilling to do so. "Booker testified he did not want Williams to know he intended to sell drugs." United States v. Williams, No. 3:09-CR-55 (D.N.D. Jan. 22, 2010).

Williams paid cash to rent a room at the Grand Inn Motel in Moorhead, Minnesota, across the Red River from Fargo, North Dakota, with money Booker gave Williams for that purpose. While Williams was renting the room, Booker and Officer

---

[2]Booker was also charged with conspiring with Williams and others to distribute and possess with intent to distribute drugs. The government dismissed this charge in exchange for Booker's guilty plea. See United States v. Booker, 639 F.3d 1115, 1117 (8th Cir. 2011).

Schmidt arranged to meet that evening. They then met in the Moorhead True Value parking lot. Williams was driving Booker's car.[3] Booker got out of his car and into the back seat of Officer Schmidt's undercover car. Booker agreed to sell Schmidt six grams of heroin and eight grams of crack for $1,900, but Schmidt did not have enough cash on hand to buy the drugs. Surveillance officers followed Williams and Booker from the True Value back to the Grand Inn Motel. Officer Schmidt soon called Booker and set up another meeting, this time at the Big Top Bingo parking lot in Fargo.

Booker and Williams decided to party at a bar/nightclub called The Hub, located directly north of the Big Top Bingo parlor. According to Booker, Williams probably would not have come to Fargo if Williams knew Booker planned to sell drugs there. Booker testified Williams had come to Fargo/Moorhead with him to "hang out with ladies and for a 'fun time.'"

Before the party started, Booker needed to repackage the drugs he was planning to sell to Officer Schmidt to correspond to the amount of money Schmidt was willing and able to pay. Booker says he sent Williams out of the motel room to warm up some soup, and Booker began the repackaging. According to Booker, when Williams returned prematurely, Booker stashed some of the drugs under the pillow of Williams's bed so Williams would not see them. The district court noted Booker's account of events at the motel room was uncontested at trial.

Williams drove Booker to The Hub. Booker got out of the vehicle and walked to the Big Top Bingo parking lot, where he was arrested. Williams was still sitting in the car's driver's seat at The Hub when he was arrested. When searched, Williams had

---

[3]This fact was contested at trial. Like the district court, we resolve the dispute in favor of the jury's verdict. See United States v. Refert, 519 F.3d 752, 758 (8th Cir. 2008).

a personal use quantity of crack cocaine (.56 grams) in his pocket. Booker had, among other things, 6.42 grams of heroin, 8.41 grams of crack cocaine, and a key to the Grand Inn motel room. In the motel room, police discovered 8.61 grams of crack cocaine in 25 individually packaged rocks under what Booker said was Williams's pillow, 4.59 grams of crack in eight individually packaged rocks and a digital scale under Booker's pillow, and plastic baggies in a television stand drawer. Booker claims all the drugs found at the motel were his. All the drugs seized from Williams, Booker, and at the motel, were packaged in clear plastic bags.

In June 2009, a grand jury returned a six-count indictment against Booker and Williams. Count 1 charged Booker and Williams with conspiring to distribute and to possess with intent to distribute crack cocaine, in violation of 21 U.S.C. § 846. Counts 2 and 3 charged Booker with distributing crack cocaine on February 19 and March 11, 2009, respectively, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Counts 4 through 6 charged Booker and Williams with possession with intent to distribute 8.97 grams of crack cocaine, 6.42 grams of heroin, and 13.2 grams of crack cocaine, respectively, on March 18, 2009, again in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Booker pled guilty to Counts 3 through 6 in exchange for the government's dismissal of Counts 1 and 2. See Booker, 639 F.3d at 1117. "Booker denied he conspired with anyone and testified in Williams's defense at Williams's trial." Id.

Before trial, the government notified Williams of its intent to introduce Fed. R. Evid. 404(b) evidence, specifically Williams's 2001 conviction for possession with intent to distribute cocaine. Williams objected. The district court deferred ruling on the issue until the evidence was offered at trial, when it overruled the objection and admitted the conviction. The certified judgment of conviction was delivered to the jury, and it stated all the conditions of Williams's supervised release, including not using drugs or associating with felons, which evidence the government argued in its closing. The district court intended that only the portion of the record showing

Williams's guilt of the crime be admitted. Throughout trial, and especially during its closing argument, the government repeatedly reminded the jury that Williams did not lack knowledge about the habits of drug dealers because he had been convicted of distributing drugs himself.

The jury convicted Williams on all counts except Count 5, which charged possession with intent to distribute heroin. Williams moved for a judgment of acquittal or, alternatively, for a new trial. The district court granted Williams's motion in full, holding the trial evidence insufficient to support the verdict and suggesting it erred both in admitting the Rule 404(b) evidence, and in allowing the government to use the evidence in the manner it did. The district court believed the verdict was tainted by "poor judicial oversight, improper argument, and unlawful references to evidence admitted in error." The court was therefore "convinced to a moral certainty that justice demand[ed] that the verdict entered against Alphonzo Ervin Williams be set aside." The government appeals. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II. DISCUSSION

### A. Judgment of Acquittal

The government appeals the district court's grant of Williams's motion for a judgment of acquittal based on insufficiency of the evidence. We review challenges to the sufficiency of the trial evidence de novo. United States v. Coleman, 584 F.3d 1121, 1125 (8th Cir. 2009). "In conducting this review, we consider the evidence in the light most favorable to the jury's verdict and draw all reasonable inferences in the Government's favor." Id. "When a district court considers a motion for acquittal, it does so with 'very limited latitude.'" United States v. Hernandez, 301 F.3d 886, 889 (8th Cir. 2002) (quoting United States v. Thompson, 285 F.3d 731, 733 (8th Cir. 2002)). This means, in part, that the district court is not free to "assess the credibility of the witnesses or weigh the evidence." Id.

To support Williams's conspiracy convictions, "the government had to prove: '(1) the existence of an agreement among two or more people to achieve an illegal purpose, (2) [Williams's] knowledge of the agreement, and (3) that [Williams] knowingly joined and participated in the agreement.'" United States v. Alyass, 569 F.3d 824, 828 (8th Cir. 2009) (quoting United States v. Whirlwind Soldier, 499 F.3d 862, 869 (8th Cir. 2007)). The district court concluded the government's evidence of knowledge was insufficient to convict Williams because mere "presence and association with Booker . . . are insufficient to establish a conspiracy."

The government's evidence that Booker knowingly joined and participated in the conspiracy consists of: (1) Williams drove Booker to Fargo/Moorhead, (2) Williams rented their shared motel room in Williams's name, (3) Williams then drove Booker to nighttime drug deals in Fargo, (4) Williams did not look at Officer Schmidt when Booker got into Officer Schmidt's car, (5) Williams had two rocks of crack cocaine weighing .56 grams in his pocket when he was arrested, (6) the packaging of the crack cocaine Williams was carrying matched the packaging of the other drugs seized from Booker and found in their motel room, (7) a $200 Western Union money wire receipt addressed to Williams also was discovered in the motel room, (8) 8.61 grams of crack cocaine was found under a pillow on Williams's motel room bed,[4] and (9) Williams is a convicted drug dealer, so he would recognize Booker's conduct was consistent with drug dealing, such as leaving Williams in the car while Booker met with others and asking Williams to pay cash to rent a motel room.

The principal problem with the district court's conclusion arises with the 8.61 grams of crack found under Williams's pillow. If Williams possessed distribution

---

[4]Booker testified the bed was Williams's and that Williams had put his suitcase on that bed. A "casino type player's card" in Williams's name was also located on the bed. Crack cocaine was found under the pillows of both beds.

quantities of crack, the jury could infer he had knowledge of the conspiracy. The court acknowledged this when it "assum[ed] from the guilty verdict that the jury did not believe Booker when he testified that he concealed his drug dealing activities from Williams and that he alone possessed with intent to distribute the crack cocaine found on him and in the motel room." Although the district court was aware "the jury's credibility determinations are not to be disturbed in a motion for acquittal," the district court found the posture of this case unusual because "unlike most cases, Williams'[s] only alleged co-conspirator contradicted the government's theory of conspiracy."

The district court reasoned, "The undisputed evidence presented to the jury demonstrated that the drugs and drug paraphernalia were found hidden in the motel room, [and] there was no surveillance of the motel room to show active participation by Williams or that Williams knew about the items concealed in the room." This statement omits two key facts. First, the physical position of the drugs under Williams's pillow, while not conclusive, is powerful circumstantial evidence of possession. Second, the "undisputed evidence" the district court refers to is Booker's testimony that Williams was not involved in Booker's drug business. On the other hand, the district court acknowledges the jury "did not believe Booker when he testified that he concealed his drug dealing activities from Williams." Having disbelieved Booker's general testimony that Williams was innocent, the jury was not then required to believe Booker's detailed testimony that the drugs under Williams's pillow were Booker's simply because no witness could contradict him. Whether or not to believe Booker's explanation for the presence of distribution quantities of crack cocaine under Williams's pillow rests on a credibility determination the jury was entitled to make. There is no requirement that a jury believe testimony from a witness it finds incredible simply because the specifics of the testimony are uncontradicted. The jury may believe all, some, or none of a witness's testimony. See United States v. Bates, 614 F.3d 490, 495 (8th Cir. 2010) (quoting United States v. Candie, 974 F.2d 61, 65 (8th Cir. 1992) (holding a sentencing judge, like "any other factfinder" is free

to believe "all, some, or none of a witness's testimony")). The district court erred in granting Williams's motion for acquittal.[5]

United States v. Pace, 922 F.2d 451 (8th Cir. 1990), discussed by the district court, is not to the contrary. In Pace, the defendants were caught transporting by car almost 200 pounds of cocaine divided among three duffle bags and a suitcase. Id. at 452-53. Pace, who was driving the car when he was stopped and arrested, had been either driving, or sleeping in the front passenger seat during the entire day and a half trip. Id. at 453. The cocaine-laden duffle bags and suitcase were positioned on the floor in the back seat or in the cargo area of the vehicle. Id. Pace's co-defendant testified he didn't tell Pace what was in the luggage. Id. The prosecutor argued the sheer amount of drugs of substantial financial value "would not be casually entrusted to an uninformed outsider" and "the extended amount of time Pace spent in the car meant that he had to have discovered what was in the luggage." Id. The jury convicted and we reversed, holding the evidence insufficient to show beyond a reasonable doubt "that Pace knew that he was helping carry cocaine across the country." Id. (citing United States v. Frol, 518 F.2d 1134, 1137 (8th Cir. 1975)).

Pace is distinguishable. Our court in Pace concluded the evidence was insufficient because "it [was] merely conjecture to conclude [Pace] knew what those packages contained." Id. There was "no evidence that Pace ever explored the cargo area of the station wagon, much less that he examined or opened [the co-defendant's] luggage that was stored there." Id. The situation in this case is significantly different, because here the distribution-quantity drugs were found under a pillow on Williams's

---

[5]The district court also concluded the government's evidence "was insufficient to allow a reasonable jury to find beyond a reasonable doubt that Williams . . . knowingly possessed with intent to distribute and distributed crack cocaine." As with the conspiracy convictions, it was for the jury to decide whether Williams knowingly possessed the crack cocaine under his pillow. We note Williams was not charged with distribution.

bed.  In <u>Pace</u>, no drugs were found among Pace's personal items, and it was certainly plausible that Pace could have inhabited the vehicle without knowing what was in the bags.  <u>Pace</u> might apply to drugs found among Booker's personal possessions, but not to drugs on Williams's bed under his pillow.

The district court also held the evidence against Williams was equivocal. "Where the government's evidence is equally strong to infer innocence as to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal." <u>United States v. Davis</u>, 103 F.3d 660, 667 (8th Cir. 1996) (quoting <u>United States v. Kelton</u>, 446 F.2d 669, 671 (8th Cir. 1971) (internal marks omitted)).  The court must weigh "the totality of the circumstances" in determining the strength of the evidence in a circumstantial case.  <u>Id.</u>  The government contends the equivocation theory is no longer valid in this circuit.[6]  It is unnecessary to wade into this legal swamp.  Even if <u>Davis</u> were good law, it does not compel acquittal in this case.  Key to <u>Davis</u> is its focus on "the government's evidence" being equivocal.  But the government's evidence here does not include Booker's testimony.  And the record lacks any other evidence that the drugs found under Williams's pillow on his bed, and near Williams's luggage, did not belong to Williams.  The balance of the evidence favors the government, not Williams.  The motion to acquit should have been denied.

## B.    New Trial

The district court also granted Williams's alternative motion for a new trial.

---

[6]We have recognized an intra-circuit conflict of authority may exist regarding the equivocation theory's viability.  <u>See</u> <u>United States v. Butler</u>, 238 F.3d 1001, 1004 (8th Cir. 2001) ("Although we are not free to overrule <u>Davis</u>, we are free to follow <u>Baker</u>, which is the standard this court has overwhelmingly favored.").  <u>Compare</u> <u>Davis</u>, 103 F.3d at 667 (recognizing the equivocation theory), <u>with</u> <u>United States v. Baker</u>, 98 F.3d 330, 338 (8th Cir. 1996) (quoting <u>United States v. Burks</u>, 934 F.2d 148, 151 (8th Cir. 1991)) (internal marks omitted) ("If the evidence rationally supports two conflicting hypotheses, the reviewing court will not disturb the conviction.").

> If the [district] court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury. This authority should be exercised sparingly and with caution; nevertheless, the trial court has wide discretion in deciding whether to grant a new trial in the interest of justice. Corresponding to the district court's broad discretion is the limited scope of our review: we will reverse the district court's ruling on the motion for new trial only if we find that ruling to be a clear and manifest abuse of discretion.

United States v. Malloy, 614 F.3d 852, 862 (8th Cir. 2010) (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)). In ruling on a motion for new trial, unlike a motion for acquittal, the district court may weigh the evidence and evaluate the credibility of the witnesses. See United States v. Davis, 534 F.3d 903, 912 (8th Cir. 2008).

In considering Williams's motion for a new trial, the district court again acknowledged "the jury did not believe a vast majority of Booker's testimony. The jurors discredited all of Booker's testimony, except they apparently believed Booker acted alone when he possessed heroin with the intent to distribute it." The district court, however, "found Booker to be a much more credible witness than the jury did." This credibility finding led the district court to believe Booker's assertions that all of the crack cocaine found in the motel room, including the quantity under Williams's pillow, belonged to Booker and not Williams.

The district court also granted Williams's new trial motion because, although a certified copy of a prior conviction is not per se erroneous, see Fed. R. Evid. 404(b) (allowing evidence of other crimes to prove, among other things, knowledge, but not to prove bad character to show action in conformity therewith), the court found "the

-10-

manner in which the government used the prior conviction at trial . . . as well as [the district court's] failure to provide proper judicial oversight" prejudiced Williams. The district court recited many instances where the government raised Williams's prior conviction at trial, and found the government impermissibly used the conviction to "mark Williams as a previous drug dealer." The district court also considered its admission of Williams's full record of conviction, complete with supervised release conditions, to be a failure of the court's oversight.

The district court held "[t]he government's use of Williams'[s] prior conviction affected Williams'[s] substantial rights and had more than a slight influence on the verdict." The government disagrees, stressing that Williams did not object and the government tied each instance of its use of the conviction to Williams's knowledge, which of course is a permitted use of Rule 404(b) evidence. We need not resolve whether the court clearly erred in finding the government, through repetition, used Williams's prior conviction to show Williams had a propensity to commit drug crimes. It is enough to say, in light of the district court's opinion after observing the trial that the Rule 404(b) evidence was misused, and the court's strong disagreement with the jury about Booker's credibility, that it was not a clear and manifest abuse of discretion for the district court to grant Williams a new trial. See Malloy, 614 F.3d at 862. We affirm the new trial grant.

## III. CONCLUSION
We affirm in part, reverse in part, and remand for a new trial.

_____

-11-