# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3212

_____

United States of America,      *

          *

      Plaintiff-Appellee,      *

          *  Appeal from the United States

      v.          *  District Court for the Southern

          *  District of Iowa.

Stephen Gill and Barbara Anne Riley,  *

          *

      Defendants-Appellants.      *

_____

Submitted:  March 6, 2007
Filed: January 24, 2008

_____

Before RILEY, HANSEN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

This case arises from a traffic stop conducted by Iowa State Trooper Kenneth Haas on February 28, 2004, during which Trooper Haas uncovered more than 975 pounds of marijuana and a loaded handgun. Based on these events, a grand jury returned an indictment charging Stephen Gill, the driver of the truck, and Barbara Anne Riley, the owner of the truck and the front seat passenger, with possession with intent to distribute 100 kilograms or more of marijuana (Count 1), a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), and charging Gill with carrying a firearm during and in relation to a drug trafficking crime (Count 2), a violation of 18 U.S.C. § 924(c). After the district court denied their motion to suppress, both defendants entered

conditional pleas of guilty to Count 1, reserving the right to challenge the search that uncovered the evidence against them. Gill proceeded to trial on Count 2 and was found guilty. On appeal, Gill and Riley allege the district court erred in denying their motion to suppress and in declining to reopen the suppression hearing record to allow admission of polygraph evidence. We also consider issues related to Gill's trial on Count 2, including 1) whether the district court erred in allowing certain trial testimony by a Drug Enforcement Administration agent; 2) whether the district court erred in declining to include a jury instruction Gill requested; 3) whether the district court erred in instructing the jury as to the elements of the firearm offense with which Gill was charged and whether any such error requires reversal; and 4) whether sufficient evidence supported Gill's § 924(c) conviction. For the reasons stated below, we affirm the judgment of the district court.

I.      Background

A.      Denial of Defendants' Motion to Suppress

Trooper Haas testified regarding the events surrounding the traffic stop at two evidentiary hearings on the defendants' motion to suppress.[1] A videotape of the encounter between Trooper Haas and the defendants was admitted into evidence. Trooper Haas testified that the tape had not been edited or altered and that it was an accurate depiction of the events occurring during the traffic stop.

---

[1]After the initial evidentiary hearing, the district court entered an order denying the defendants' suppression motion. After a change of defense counsel, the court granted the defendants' request to reopen the record and held a second evidentiary hearing for the limited purpose of allowing the defendants to testify. Following the second hearing, the district court entered a second order denying defendants' motion to suppress. The district court's second order outlined "[o]nly those facts not previously addressed and relevant," and supplemented, rather than supplanted, the analysis of the previous order. In the second order, the court reaffirmed its earlier rulings.

Based on Trooper Haas's testimony and the video recording of the traffic stop, Trooper Haas stopped a white Chevy pickup truck driving east on Interstate 80 at approximately 4:00 p.m. on February 28, 2004. Trooper Haas stopped the truck because it lacked a front license plate and it appeared to have excessive window tinting, both violations of Iowa law. Gill was driving the truck, which was registered to Riley, the passenger. The truck carried a California license plate, and Trooper Haas knew California is a drug-source state.

Trooper Haas approached the truck and asked Gill for his license, registration, and proof of insurance. As Gill opened his wallet, Trooper Haas noticed Gill was shaking. Gill, who is a bail bondsman and fugitive apprehension agent, attempted to display a badge in his wallet as he responded to Trooper Haas's request. Trooper Haas found it unusual that a driver with a badge would be shaking during an encounter with a law enforcement officer. After determining that Riley was the owner of the truck, Trooper Haas requested her license. Trooper Haas asked Gill to step back to the patrol car.

After Trooper Haas and Gill returned to the patrol car, Trooper Haas ran driver's license and criminal history checks on Gill and Riley. While running these routine checks, Trooper Haas engaged Gill in conversation and observed Gill's continued nervous demeanor. Upon questioning, Gill stated that he and Riley, his wife, were traveling from California to Ohio to visit Gill's children and inform them that their grandmother, Gill's mother, was critically ill. Gill said they wanted to pass on this information in person, rather than over the phone. Trooper Haas found this explanation unusual. During this conversation, Gill's criminal history check came back, indicating that Gill had a prior drug arrest. Trooper Haas asked about Gill's criminal history, and Gill denied having any prior arrests. Trooper Haas also asked Gill about the straps and wires he noticed on top of the truck's opaque fiberglass bedcover. Trooper Haas was familiar with the bedcover's features and knew that the

bedcover has its own latching and locking system. Trooper Haas identified the extra straps and wires as excessive and out of place.

Trooper Haas asked Gill to remain in the patrol car while he returned to the truck to speak with Riley. Trooper Haas explained Iowa's window-tint law to Riley and inquired about the nature of her trip. Riley explained they were traveling to Iowa. This response differed from Gill's earlier statement that they were headed to Ohio. Trooper Haas repeated "Iowa" back to Riley, and she reconfirmed that Iowa was their destination. Riley specified the couple was going to Brunswick, Iowa, and confirmed that destination when Trooper Haas inquired.

Trooper Haas asked about the purpose of their travels, and Riley stated she and Gill were visiting Gill's children. When questioned by Trooper Haas as to whether there was a family problem, Riley stated that Gill's mother was recently diagnosed with cancer and given two weeks to live. Unlike Gill, Riley did not say the purpose of the trip was to share this news with the children. Trooper Haas noted that Gill and Riley provided inconsistent statements as to the number of their children and grandchildren. Trooper Haas noticed Riley displayed signs of nervousness.

After speaking with Riley, Trooper Haas returned to the patrol car to complete the warning citation. Gill remained in the patrol car as Trooper Haas completed the paperwork. Trooper Haas gave Gill the warning citation and answered Gill's questions about the paperwork. Gill signed the citation and returned to the truck.

Trooper Haas asked Riley to return to the patrol car to complete her processing and return her paperwork. Trooper Haas received the criminal history report on Riley indicating she had prior arrests for possessing a concealed weapon and possessing drugs with the intent to distribute, and he asked Riley if she had ever been arrested. Initially, Riley denied having ever been arrested, but then she corrected her response and stated she had been arrested "a long, long time ago." Riley denied the arrest was

-4-

for carrying a weapon and stated there were no weapons in the truck. Trooper Haas informed Riley she was free to leave and asked if she had any questions. Riley responded that she did not.

As Riley was walking back to her truck, about twenty minutes after Trooper Haas initiated the traffic stop, Trooper Haas asked if he could ask Riley a few more questions. Riley did not respond to the request, but she was attentive to it. Trooper Haas asked Riley whether there were firearms in the vehicle and whether there was marijuana, methamphetamine, or heroin in the vehicle. In response to each question, Riley emphatically shook her head from side to side and stated "no." Trooper Haas asked for consent to search the truck. In response, Riley asked why the trooper would need to search the vehicle. Trooper Haas told Riley he wanted to search because of Riley's history with weapons and drugs.

Trooper Haas asked a second time if he could search the truck, and, this time, Riley looked at Gill and asked, "Why is he asking me?" Trooper Haas clarified that he was asking Riley, not Gill, and Riley again asked the trooper why he was asking her. Trooper Haas informed Riley he wanted to search the truck because he believed she possessed illegal guns or drugs. Riley told the trooper she was sober and denied having any contraband in the truck. Trooper Haas asked if Gill had anything illegal in the truck, and Riley responded that he did not.

At this point, Trooper Haas resumed his discussion with Riley about the number of children and grandchildren the defendants have and their destination. Riley again stated they were heading to Iowa, a continued inconsistency with Gill's comments. Trooper Haas requested that both Riley and Gill sit in the patrol car; Trooper Haas stated he was going to contact a drug-detecting dog unit.

In the patrol car, Trooper Haas told the defendants he wanted to make sure there were no guns, drugs, or bombs in the truck. He also informed the defendants about

-5-

the inconsistencies in their responses to his inquiries about their travel plans. Trooper Haas told Riley that consenting or refusing the search of the truck was up to her. Gill interjected, "If you wanna search, go ahead, search my truck. I don't care." Because the truck belonged to Riley, Trooper Haas again stated the consent decision was Riley's; Trooper Haas explained the consent form to Riley.

Gill then mentioned, for the first time, that there was a weapon and a bulletproof vest in the truck, commenting that he was supposed to "pick up a guy" on the way back from visiting the kids. He further explained that the gun was registered and that Riley was unaware of the weapon. Trooper Haas continued to focus on Riley, making sure she understood the consent form. Riley signed the form, consenting to the search of her truck. When Riley signed, just under six minutes had elapsed since Trooper Haas told Riley she was "free to go."[2]

---

[2] The district court heard additional testimony at the second evidentiary hearing. Gill and Riley both testified that a portion of the encounter with Trooper Haas was missing from the video recording entered into evidence; they contended Riley and Trooper Haas had a "very heated" argument that was omitted. In essence, the defendants alleged that Trooper Haas badgered or intimidated Riley into signing the consent form and that this portion of the encounter was not on the videotape. The defendants presented testimony from Emory Emory, who professionally edits and reproduces videotapes, in support of their theory. Based upon a frame-by-frame review of the tape, Emory testified he believed the tape had been disrupted. In Emory's opinion, a car in the background of the video was out of place from one frame to the next. The district court found Trooper Haas's testimony regarding the circumstances surrounding Gill's consent to be more credible than the testimony of Gill, Riley, and Emory. Based upon Trooper Haas's testimony and the court's own review of the videotape, the court concluded there was no gap of time on the videotape. The court found the videotape recorded the entire encounter between the defendants and Trooper Haas. On appeal, the defendants acknowledge they cannot show this finding of fact to be clear error. As such, we will not consider any alleged statements or events not reflected on the video.

Riley and Gill remained in the patrol car, and Trooper Haas searched the truck. The search uncovered eighty-two packages of marijuana with a total weight of 982 pounds. Trooper Haas also located a loaded handgun.

Based upon the evidence presented at the two evidentiary hearings, the district court denied the defendants' motion to suppress. The court concluded that 1) the defendants were not, in fact, free to leave at the conclusion of the initial traffic stop; 2) Trooper Haas briefly detained the defendants based upon reasonable suspicion following the completion of the initial traffic stop; and 3) during this brief investigatory detention, Riley voluntarily consented to the search of the truck.

After the district court issued its final order denying the defendants' motion to suppress, the defendants filed a motion to reopen the record to present testimony from a polygraph operator who had administered polygraph examinations to Gill and Riley. The defendants assert that the polygraph operator would have testified, based upon his examination, that Gill and Riley testified truthfully at the second evidentiary hearing. The district court denied the motion, concluding that a reopening of the record for the purposes of receiving the polygraph testimony was unnecessary because the evidence would be of minimal value to the court.

B.     Trial

At trial on the firearm charge, Trooper Haas recounted the events surrounding the traffic stop and search on February 28, 2004. In addition to some of the information outlined above, Trooper Haas specifically testified about finding Gill's handgun. He testified that he found the gun stored in a side-zippered pocket in a black bag on the floor behind the driver's seat. The handgun was not stored with the majority of Gill's fugitive-recovery equipment, such as his bulletproof vest and baton; it was in the bag containing his personal clothing. The handgun was fully loaded with a round in the chamber. Trooper Haas also testified that, in his experience, when a

law enforcement officer is pulled over for a traffic violation, the officer immediately informs the officer making the traffic stop that he or she is carrying a loaded firearm. Trooper Haas also testified that during the course of his duties, he had previously encountered individuals who possessed firearms while transporting marijuana.

The government also presented testimony from DEA Special Agent Donato Sikorski. After recounting his background, experience, and training, Agent Sikorski testified that Interstate 80, a main route east from the West Coast, often presents the opportunity for interdiction of illegal drugs being transported across the United States. He explained that one pound of marijuana has an estimated street value of $900–1200, making $877,000 a conservative estimate of the value of 975 pounds of marijuana. Agent Sikorski also testified about the link between guns and drugs. He testified that he has seen individuals possess firearms while transporting large loads of marijuana. He further testified, over objection, that:

> Those involved in drug trafficking realize that their drug-trafficking activities are, No. 1, illegal; No. 2, the amount of drugs that they come into possession of are worth a certain street value and, to a certain extent, if they are not successful in distributing those drugs, if those drugs get lost or get stolen, they're typically responsible for the value of those drugs to a supplier or a customer, et. cetera. Therefore, firearms would be used in protection of the illicit drugs or possibly the proceeds from the sale of such.

Gill testified in his own defense. He testified that he was traveling from California to Ohio to visit his children. Gill claimed he first became aware of the marijuana about forty-five to sixty minutes before the traffic stop, although he did not discuss the marijuana with Riley. He stated that after he noticed the marijuana, he secured the tonneau cover over it. He hypothesized that the marijuana was put into the truck while he was inside a casino in Iowa.

-8-

The parties stipulated that Gill was in pursuit of three fugitives and that he had documentation supporting the warrants on the three fugitives in his briefcase. Gill testified that he intended to travel to Denver, Colorado, on his return to California to apprehend a fugitive. The materials regarding that fugitive indicated that the warrant was more than one-year old and that the lead as to the fugitive's location was not recently obtained. Gill testified that he possessed the handgun only for use in apprehending fugitives.

C. Jury Instructions

Before the district court submitted the case to the jury, Gill asked the court to include in the jury instructions an admonition to the jury that, in circumstantial evidence cases, a jury must return a verdict of not guilty if the evidence equally supports an inference of guilt and one of innocence. Gill acknowledged that this instruction had not been approved by the Eighth Circuit. The district court rejected the proposed instruction.

The jury instruction listing the offense on which Gill was tried was inconsistent with the offense as listed in the indictment. Neither party brought the differences to the district court's attention, and Gill did not object to the instructions relating to the elements of the offense. Gill was charged with "carrying" a firearm "during and in relation to" a drug trafficking crime. In contrast, the jury instructions and verdict form listed the offense as "carrying a firearm in furtherance of drug trafficking."

During deliberations, the jury sent a note to the court asking for additional instruction on the definition of "in furtherance of." While the court was discussing the proper response to the inquiry with the parties, the jury notified the court that it had reached a verdict. Nonetheless, the court, with the agreement of the parties, sent the jury the following response:

The phrase "possessed in furtherance of" means the firearm must have some purpose or effect with respect to possession with intent to distribute marijuana; its presence or involvement cannot be the result of accident or coincidence. The firearm must facilitate or have the potential to facilitate the offense of possession with intent to distribute marijuana.

Ten minutes after receiving this supplemental instruction, the jury returned its verdict.

### D.    Sentencing

The district court sentenced both defendants on August 24, 2006.  Riley, who had a prior felony drug conviction, was sentenced to the statutory mandatory minimum for her offense: 120 months.  See 21 U.S.C. § 841(b)(1)(B).  Gill received 78 months for the drug trafficking crime and a mandatory consecutive term of 60 months for the firearm offense.  See 18 U.S.C. § 924(c).  The defendants do not challenge the sentences imposed.

## II.    Discussion

### A.    Denial of Defendants' Motion to Suppress

Gill and Riley appeal the denial of their motion to suppress.  First, Gill and Riley claim the district court erred in concluding Trooper Haas had reasonable suspicion to detain them for further investigation after the completion of the initial traffic stop.[3]  They argue that they were unlawfully seized in violation of their Fourth Amendment rights when Trooper Haas expanded the traffic stop and that Riley's

---

[3]  The defendants do not contest the validity of the initial traffic stop or the manner in which Trooper Haas conducted the investigation regarding the traffic violations.  The government does not challenge the district court's conclusion that the continuing encounter between Trooper Haas and the defendants was non-consensual. As such, we do not address these issues.

consent to search was the product of the unlawful detention. See Ohio v. Robinette, 519 U.S. 33, 51 (1996) ("Because [the defendant's] consent to the search was the product of an unlawful detention, 'the consent was tainted by the illegality and was ineffective to justify the search.'" (quoting Florida v. Royer, 460 U.S. 491, 507–08 (1983))). Second, they argue that Riley's consent was coerced. See Schneckloth v. Bustamonte, 412 U.S. 218, 225–26 (1973) (noting that consent must be voluntarily given to serve as an exception to the warrant requirement of the Fourth Amendment). We address each of these claims in turn.

### 1. Expansion of the Traffic Stop

We review a district court's factual findings for clear error and review de novo whether a search violated the Fourth Amendment. Ornelas v. United States, 517 U.S. 690, 698–99 (1996); United States v. Gallardo, 495 F.3d 982, 986 (8th Cir. 2007). The defendants do not claim the district court clearly erred in its findings of fact; rather, they challenge the court's legal conclusions arising from those facts. We therefore accept the facts as found by the district court and limit our discussion to the question of whether Trooper Haas had reasonable suspicion to expand the scope of the traffic stop.

If an officer develops reasonable suspicion regarding unrelated criminal conduct during the course of a lawful traffic stop, "an officer may broaden his inquiry and satisfy those suspicions" without running afoul of the Fourth Amendment. United States v. Jones, 269 F.3d 919, 926–27 (8th Cir. 2001) (quotation omitted). Reasonable suspicion requires "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." United States v. Donnelly, 475 F.3d 946, 952 (8th Cir. 2007) (quotation omitted); see also Terry v. Ohio, 392 U.S. 1, 20–21 (1968). "Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by

looking at the totality of the circumstances, in light of the officer's experience." United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002) (quotation omitted).

Based on the totality of the circumstances, we conclude there was reasonable suspicion to expand the scope of the traffic stop to include an investigation into whether Gill and Riley were transporting contraband. Trooper Haas brought to the encounter more than nine years of experience, which includes more than 120 major highway drug interdictions. During the course of the traffic stop, Trooper Haas learned that Gill had a prior arrest related to drugs and that Riley had prior arrests for drugs and weapons. Neither of the defendants answered questions about their criminal records forthrightly. Both of the defendants showed signs of nervousness. Gill, who apparently carries a badge because of his fugitive-apprehension duties, attempted to show Trooper Haas his badge while retrieving identification from his wallet. Gill shook while he handled his wallet. The condition of the truck was also relevant. The truck has a hydraulic bedcover that closes and locks without external mechanisms. Yet, the defendants' tonneau cover was latched down with extra wires and straps. Further, the defendants gave inconsistent statements about their travel plans. Gill stated the couple was traveling to Ohio, while Riley repeatedly stated they were going to Iowa. Riley did not say they were traveling to tell the children that their grandmother was ill, while Gill stated that was the purpose of the trip. The defendants also provided differing answers about the number of children and grandchildren in their blended family. While these inconsistencies, in isolation, may not be indicative of criminal activity, taken with the other facts Trooper Haas encountered, they contributed to reasonable suspicion that criminal activity was afoot. Donnelly, 475 F.3d at 953. Considering the totality of the circumstances in light of Trooper Haas's experience, there was reasonable suspicion to expand the scope of the traffic stop to explore whether Gill and Riley were transporting contraband.

We also conclude that asking questions and seeking to obtain consent to search the truck were reasonable and permissible methods of continuing the investigation that

did not unduly prolong the detention. An investigatory stop supported by reasonable suspicion can become unlawful if it "lasts for an unreasonably long time." United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999). During an investigatory detention, an officer "must . . . employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose" of the stop. Id.

Questioning Riley about the possession of contraband and requesting her consent to search the truck constituted a "minimally intrusive way of addressing [Trooper Haas's] reasonable suspicion." Donnelly, 475 F.3d at 953. Trooper Haas could have requested a drug-detecting dog unit conduct a drug sniff to confirm or dispel his reasonable suspicion that criminal activity was afoot. See Linkous, 285 F.3d at 720–21. This approach could have resulted in a much longer, and yet still constitutionally permissible, delay to Gill and Riley. See, e.g., Donnelly, 475 F.3d at 953-54 (upholding as reasonable an hour delay while waiting for a drug dog to respond to a traffic stop on Interstate 80 in Iowa); United States v. Maltais, 403 F.3d 550, 557–58 (8th Cir. 2005) (holding that a three-hour delay allowing a drug dog to reach the remote traffic stop location was acceptable). That Trooper Haas chose to seek consent to search — an endeavor that took less than five minutes — instead of or prior to contacting a drug dog does not render this brief investigatory detention unreasonable. See Gallardo, 495 F.3d at 988 (upholding a search based upon consent obtained during an investigatory detention following the completion of a traffic stop); see also United States v. Urbina, 431 F.3d 305, 308–09 (8th Cir. 2005) (upholding a search based upon consent when a drug dog was present at the scene, but not utilized because the defendant consented to a search).

We agree with the district court that Riley was not unlawfully detained at the time she gave consent to search the truck. The investigatory detention was reasonable under the circumstances.

2.    Consent to Search

We review a district court's finding of voluntary consent to search for clear error.  United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006).  The defendants acknowledge the district court did not clearly err in concluding the videotape of the encounter with Trooper Haas reflected the entirety of the traffic stop.  They further conceded at oral argument that there is no evidence, aside from the testimony the district court found not to be credible, to support a claim that Riley was coerced into consenting to the search.  Because the district court's finding enjoys ample support and the defendants have acknowledged the dearth of credible evidence supporting this claim, we decline to discuss it further.  Thus, we conclude the district court did not clearly err in finding that Riley was not coerced and that she voluntarily consented to the search of the truck.

For the foregoing reasons, we conclude the district court did not err in denying the defendants' motion to suppress evidence.

B.    Reopening of Suppression Record for Polygraph Evidence

The defendants allege the district court erred by denying their motion to reopen the record on their motion to suppress.  Gill and Riley contend the court should have reopened the record to allow consideration of testimony regarding polygraph examinations given to them.  They argue this evidence would have assisted the court in determining whether Riley voluntarily consented to the search of the truck.  We review a district court's denial of a motion to reopen a suppression hearing for abuse of discretion.  United States v. Johnson, 944 F.2d 396, 403 n.5 (8th Cir. 1991) (applying abuse-of-discretion review to decision to reopen suppression-hearing record).

Our cases make clear that polygraph evidence is disfavored. See, e.g., United States v. Swayze, 378 F.3d 834, 837 (8th Cir. 2004) ("When two witnesses contradict each other, juries, not polygraph tests, determine who is testifying truthfully."); Ortega v. United States, 270 F.3d 540, 548 (8th Cir. 2001) (noting the consensus among the courts of appeal against the use of polygraph evidence at sentencing and rejecting the use of polygraph evidence as grounds for a sentencing enhancement for obstruction of justice); Anderson v. United States, 788 F.2d 517, 519 n.1 (8th Cir.1986) (noting this court's "rule that polygraph examination results should not be admitted absent stipulation"). Because "'there is simply no consensus that polygraph evidence is reliable,'" Ortega, 270 F.3d at 548 (quoting United States v. Scheffer, 523 U.S. 303, 309 (1998)), the evidence proffered by the defendants would have been of little or no value to the district court in ruling on defendants' motion to suppress, see e.g., United States v. Sockel, 478 F.2d 1134, 1135–36 (8th Cir. 1973) (rejecting a defendant's claim of error arising from a district court's denial of the defendant's offer to take a polygraph exam in support of his motion to suppress). The district court heard all of the relevant testimony and made credibility determinations and findings of fact based on the evidence presented; the district court did not abuse its discretion when it declined to reopen the record for evidence of limited probative value.

C.    DEA Agent Testimony

Gill alleges the district court erred in admitting expert testimony[4] by Agent Sikorski about the link between firearms and drug trafficking. We review a district court's decision regarding the admission of evidence for abuse of discretion. United States v. Jiminez, 487 F.3d 1140, 1145 (8th Cir. 2007).

We have repeatedly held that "a district court has discretion to allow law enforcement officials to testify as experts concerning the modus operandi of drug dealers in areas concerning activities which are not something with which most jurors are familiar." Urbina, 431 F.3d at 311 (alteration and quotation omitted). Further, we have specifically found no abuse of discretion in admitting expert testimony from drug agents regarding the use of firearms as tools of the drug trade. See, e.g., United States v. Boykin, 986 F.2d 270, 275 (8th Cir. 1993). As we have noted, "this type of expert evidence has become almost routine in drug cases."[5] United States v. Ortega, 150 F.3d 937, 943 (8th Cir. 1998).

---

[4]We note that the district court did not characterize the contested evidence as expert testimony in its ruling on post-trial motions, although it repeatedly stated the contested testimony was based on Agent Sikorski's training and experience. The parties, however, characterize the testimony in question as expert testimony. In addition, the substance of Agent Sikorski's testimony is indistinguishable from testimony this court has previously identified as expert testimony. See, e.g., United States v. Hilliard, 490 F.3d 635, 641(8th Cir. 2007) (listing as "expert testimony" a detective's testimony regarding the "common role of firearms in protecting drug dealers and the cash they often possess"); United States v. Newton, 31 F.3d 611, 613 (8th Cir. 1994) (noting that experienced narcotics officers may testify as experts about the modus operandi of drug dealers, including the use of firearms). Thus, we will refer to the testimony as expert testimony and analyze it as such.

[5]Although this type of evidence has become commonplace, the frequency of its use does not lessen the government's obligation to lay a proper foundation as to the witness's experience and training and to formulate its examinations appropriately.

The testimony Gill challenges falls squarely within the range of expert testimony we have found to be admissible. Agent Sikorski, who had participated in more than one hundred drug investigations in his five years with DEA, testified based on his training and experience. Cf. United States v. Robertson, 387 F.3d 702, 704–05 (8th Cir. 2004) (recounting approvingly the qualifications of two officers who testified as drug trafficking experts after two and three years of narcotics experience). Agent Sikorski testified he had seen individuals possess firearms while transporting large loads of marijuana. He further testified that, based upon his general training and interviews conducted with individuals involved in the drug trade, those involved in drug trafficking possess firearms to protect both their drugs and the proceeds from drug sales. Cf. Hilliard, 490 F.3d at 641 (noting that an officer presented expert testimony on "the common role of firearms in protecting drug dealers and the cash they often possess"). Gill asserts this testimony should have been excluded because Agent Sikorski's experience did not include interactions with individuals who were both trafficking drugs and licensed to carry firearms. This argument goes to the weight to be accorded the testimony, not its admissibility. Further, Gill thoroughly explored the divergence between Agent Sikorski's experience and the specific facts of this case in cross-examination. See Urbina, 431 F.3d at 312 (considering the defendant's opportunity to cross-examine an agent's expert drug testimony in finding no abuse of discretion in its admittance).

Because Agent Sikorski's testimony assisted the jury in "understanding the business of drug trafficking," Robertson, 387 F.3d at 704, we conclude the district court did not abuse its discretion in admitting the challenged testimony.

D.      Burden of Proof Jury Instructions

Gill challenges the district court's denial of his requested jury instruction generally relating to the quantum of proof required in a circumstantial-evidence case. Gill did not propose a specific instruction, but asked the district court to include an

instruction explaining generally that when the government's evidence is equally strong to infer innocence as to infer guilt, the verdict must be one of not guilty. "We review a district court's rejection of a defendant's jury instruction for abuse of discretion." United States v. Gladney, 474 F.3d 1027, 1032 (8th Cir. 2007).

Among other things, jury instructions must "adequately apprise the jury of the . . . burden of proof required of the government." United States v. Brown, 478 F.3d 926, 928 (8th Cir. 2007). Here, the court instructed the jury that the government was required to prove each essential element of the crime charged beyond a reasonable doubt. The court further defined reasonable doubt using an instruction we have "specifically and repeatedly approved."[6] United States v. Davis,103 F.3d 660, 669 (8th Cir. 1996) (upholding the use of the instruction at issue here).

Gill's argument in favor of his alternative instruction is identical to that put forth and rejected in Davis; Gill's argument, "in essence, is based on nothing more than a particular wording of the government's burden of proof." Id. (rejecting Davis's argument that the jury instructions should have stated "that the jury must find the defendant not guilty if the circumstantial evidence was equally susceptible to guilt as to innocence"). Moreover, Gill did not even put forth "particular wording"; Gill generally advocated an alternative interpretation of the definition of reasonable doubt to be applied in circumstantial-evidence cases. The district court was under no obligation to use the definition of reasonable doubt favored by the defendant, "so long

---

[6] Jury Instruction No. 13 stated the following:

A reasonable doubt is a doubt based upon reason and common sense, and not the mere possibility of innocence. A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it. However, proof beyond a reasonable doubt does not mean proof beyond all possible doubt.

as the court instruct[ed] the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt." Victor v. Nebraska, 511 U.S. 1, 5 (1994). We conclude the district court did not abuse its discretion by declining to use the defendant's preferred definition of reasonable doubt.

E.    Section 924(c) Jury Instructions

We turn now to a discussion of the jury instructions explaining the firearm offense with which Gill was charged. The grand jury returned an indictment alleging Gill "did knowingly and intentionally carry one or more firearms during and in relation to drug trafficking crimes." At trial, the jury instructions labeled the offense "carrying a firearm in furtherance of drug trafficking." The jury instructions listed "knowing[] possess[ion] [of] a firearm in furtherance of" drug trafficking as an element of the offense. Instruction No. 9 described the charged offense, enumerated the elements the government was required to prove beyond a reasonable doubt, and defined relevant terms. The instruction is reproduced here in full:

CARRYING A FIREARM IN FURTHERANCE OF DRUG
TRAFFICKING: ELEMENTS OF THE OFFENSE

The crime of carrying a firearm in furtherance of drug trafficking has two essential elements, which are:

1)    The defendant, STEPHEN GILL, committed the crime of possession with intent to distribute marijuana; and

2)    The defendant knowingly possessed a firearm in furtherance of that crime.

It is not required that the defendant had the firearm on his person for the defendant to have "carried" the firearm. You may find that a firearm was "carried" during the commission of the crime of possession with

-19-

intent to distribute marijuana if you find that the defendant was transporting a firearm in the vehicle.

It is not required that the defendant used the weapon in any affirmative manner to prove that defendant carried the weapon. It is not required that the sole purpose for carrying the firearm was the drug trafficking crime. In determining whether the defendant carried a firearm, you may consider all of the factors received in evidence in the case including the nature of the underlying drug trafficking crime alleged, the proximity of the defendant to the firearm in question, the usefulness of the firearm to the crime alleged, and the circumstances surrounding the presence of the firearm.

For you to find the Defendant guilty of the crime charged under the Indictment, the government must prove these two essential elements beyond a reasonable doubt; otherwise you must find the Defendant not guilty of the crime charged under the Indictment.

We consider whether the district court correctly instructed the jury and whether any error requires reversal.

Our first hurdle is determining the standard of review. Generally, when evaluating jury instructions, we review for abuse of discretion. United States v. Stuckey, 220 F.3d 976, 979 (8th Cir. 2000). When there is no objection to the instructions in question at trial, as was the case here, we review for plain error, reversing only if there is clear error that affects substantial rights. United States v. Urkevich, 408 F.3d 1031, 1036 (8th Cir. 2005). However, the facts presented raise the possibility that the jury instructions constructively amended the indictment, which may require a different standard. Because we conclude the jury instructions did not constructively amend the indictment, we conclude plain error review is proper.

Constructive amendment "occurs when the essential elements of the offense set forth in the indictment are in effect altered by the prosecutor or the court after the

grand jury has passed upon them." United States v. Barrios-Perez, 317 F.3d 777, 779 (8th Cir. 2003) (quotation and alterations omitted). Jury instructions constructively amend an indictment if they, in effect, allow the jury to convict the defendant of an offense other than the one alleged in the indictment. See, e.g., Stirone v. United States, 361 U.S. 212, 217 (1960) (concluding that instructions that informed the jury they could convict if the defendant obstructed shipments of sand *or* obstructed shipments of steel constructively amended the indictment when the indictment alleged only obstruction of shipments of sand). If "the presentation of evidence and jury instructions . . . so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment," the indictment has been constructively amended. United States v. Hathaway, 798 F.2d 902, 910 (6th Cir. 1986); see also United States v. Whirlwind Soldier, 499 F.3d 862, 870 (8th Cir. 2007). This court has repeatedly stated that constructive amendments are per se prejudicial and constitute reversible error. See Barrios-Perez, 317 F.3d at 779 ("Constructive amendment of an indictment constitutes reversible error . . . ."); Stuckey, 220 F.3d at 981 ("A constructive amendment is reversible error per se . . . ."); United States v. Begnaud, 783 F.2d 144, 147 n.4 (8th Cir. 1986) (noting that an actual or constructive amendment of an indictment is "reversible error per se"); but see United States v. Burnett, 582 F.2d 436, 438 (8th Cir. 1976) ("[A] finding of prejudice to the defendant must be present before an amendment is held impermissible.").

The asserted per se prejudice rule was not determinative in any of the Eighth Circuit cases in which it was propounded. See, e.g., Barrios-Perez, 317 F.3d at 780 (finding no constructive amendment); Stuckey, 220 F.3d at 981 (declining to decide whether a jury instruction constituted a constructive amendment); United States v. Emery, 186 F.3d 921, 927 (8th Cir. 1999) (finding no constructive amendment); Begnaud, 783 F.2d at 148 (same). It therefore is dicta. See Black's Law Dictionary 1102 (8th Ed. 2004) (defining "obiter dictum" as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case

and therefore not precedential"). We question whether a constructive amendment constitutes reversible error per se. This position has been critiqued by other courts. <u>See, e.g.</u>, <u>Hathaway</u>, 798 F.2d at 910 n. 5 (noting that the per se prejudice rule has been "persuasively criticized" as inconsistent with Supreme Court precedent and recounting cases where prejudice has been required). This court, in fact, has required a showing of prejudice for an amendment to constitute reversible error. <u>Burnett</u>, 582 F.2d at 438. Moreover, in <u>United States v. Allen</u>, 406 F.3d 940, 943–44 (8th Cir. 2005) (en banc), we discussed the limitations of <u>Stirone</u>, the Supreme Court case on which the purported per se prejudice rule relies. As we stated in <u>Allen</u>,

> At the time of <u>Stirone</u> . . . , the Supreme Court had not yet grappled with the question whether constitutional error can be harmless. The Court did so expressly for the first time in <u>Chapman v. California</u>, 386 U.S. 18, 20, 23–24 (1967), when it rejected the view that all constitutional errors automatically call for reversal and held that—with a few exceptions—federal courts may not grant relief when a constitutional error is shown to be harmless beyond a reasonable doubt.

<u>Allen</u>, 406 F.3d at 944. In addition, the Supreme Court has applied harmless-error review when an erroneous jury instruction omits an element of an offense, a situation similar to the facts at hand. <u>Neder v. United States</u>, 527 U.S. 1, 15 (1999).

We need not resolve our questions about the purported per se prejudice rule, however, because we conclude the instructions in this case did not constructively amend the indictment. As relevant to the trial, the grand jury alleged Gill "did knowingly and intentionally carry one or more firearms during and in relation to drug trafficking crimes." This allegation tracks the applicable statutory language of 18 U.S.C. § 924(c). Section 924(c) states, in pertinent part,

> [A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in

furtherance of any such crime, possesses a firearm, shall [face additional penalties] . . . .

18 U.S.C. § 924(c)(1)(A). This court has previously held that § 924(c) lists two separate offenses: 1) using or carrying a firearm during and in relation to a crime of violence or drug trafficking crime, and 2) possessing a firearm in furtherance of a crime of violence or drug trafficking crime. United States v. Gamboa, 439 F.3d 796, 810 (8th Cir. 2006).[7] Thus, the indictment correctly listed one of the two § 924(c) offenses. Cf. Combs, 369 F.3d at 930, 936 (considering an indictment that combined portions of the two separate § 924(c) offenses by alleging the defendant *possessed* a firearm *during and in relation to* a drug trafficking crime).

The jury instructions, however, did not consistently track the appropriate statutory language. First, although the charge listed in the indictment was properly represented to the jury, the jury instructions and verdict form *labeled* the offense as "carrying a firearm in furtherance of drug trafficking." This label erroneously combines the correct action, "carrying," with the standard of participation, "in furtherance of," from the second § 924(c) offense. Second, the jury instructions listed two essential elements for the firearm offense:

1) The defendant, STEPHEN GILL, committed the crime of possession with intent to distribute marijuana; and

2) The defendant knowingly *possessed* a firearm *in furtherance of* that crime.

---

[7] We acknowledge a divergence among our sister circuits on this issue. Compare United States v. Combs, 369 F.3d 925, 930–33 (6th Cir. 2004) (concluding § 924(c) lists two separate offenses) with United States v. Arreola, 467 F.3d 1153, 1161 (9th Cir. 2006) (concluding that § 924(c) does not list two separate offenses, but two ways to commit the same offense).

(emphasis added). The first element is unobjectionable. In the second element, the instructions omit any reference to "carried" and "during and in relation to," and instead track the requirements for the second § 924(c) offense. Although "carried" was omitted from the elements of the offense, the instructions nonetheless correctly explained the import of the term "carried," noting, among other things, that: "You may find that a firearm was 'carried' during the commission of the crime of possession with intent to distribute marijuana if you find that the defendant was transporting a firearm in the vehicle." However, the instructions also defined "possess," and, in a supplementary instruction, the court explained the meaning of "in furtherance of." Neither of these terms is relevant to Gill's alleged offense.

The jury instructions did not correctly label the offense on which Gill was being tried. The instructions further misstated one of the essential elements the jury had to find beyond a reasonable doubt in order to find Gill guilty as charged. They defined superfluous terms. At this point in our analysis, however, the question is not whether the instructions could have been better. Instead, we consider whether the instructions amounted to a denial of Gill's constitutional right to indictment by the grand jury. See U.S. Const. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ."). Because the jury instructions did not create a substantial likelihood that Gill could have been convicted of an offense other than the offense charged by the grand jury, we conclude the jury instructions did not constructively amend the indictment.

As discussed above, in Gamboa, we concluded that § 924(c) includes two offenses. Gamboa, 439 F.3d at 809–10. The first offense requires a finding that the defendant "used or carried" a firearm, while the second "merely requires possession." Id. at 810. Gill was charged with carrying a firearm, not using it. Using a firearm requires active employment of the weapon, Bailey v. United States, 516 U.S. 137, 144 (1995), while an individual can carry a firearm merely by knowingly transporting it in a vehicle, Muscarello v. United States, 524 U.S. 125, 136–139 (1998). Put another

way, one can possess a firearm without using it, but one cannot carry a firearm without possessing it.  See United States v. Ceballos-Torres, 218 F.3d 409, 413 (5th Cir. 2000) (in discussing § 924(c), noting "[c]arrying must fall within the definition of possess").  Because Gill was charged with "carrying" a firearm, not "using" it, and because the evidence presented unequivocally demonstrates that Gill was knowingly transporting the handgun in the truck, the term "possess" in the jury instructions did not create a substantial likelihood that the jury could have convicted Gill of an offense other than the one with which he was charged.

The Gamboa court also concluded the two § 924(c) offenses have different "standard[s] of participation."  Gamboa, 439 F.3d at 810.  To be found guilty of the "use or carry" offense, a defendant need only use or carry a firearm "during and in relation to" a qualifying offense.  Id.  In contrast, to be found guilty of the "possession" offense, a defendant must possess a firearm "in furtherance of" a drug trafficking offense or violent crime.  Id.  In the case at hand, the instructions mistakenly listed "in furtherance of" instead of "during and in relation to" as the standard of participation applicable to Gill's offense.  "[T]he language 'in furtherance of' requires a slightly higher standard of participation than the language 'during and in relation to,' such that 'during and in relation to' is encompassed by the broader language 'in furtherance of.'"  Id. (citation omitted).  Because the instructions required the jury to find a *higher* level of participation than the charged offense, the instructions did not provide the jury with the opportunity to convict Gill of an offense other than the one with which he was charged.  Cf. Combs, 369 F.3d at 936 (finding a constructive amendment when the instruction erroneously allowed the jury to convict a defendant of an "in furtherance of" crime based upon the lesser "during and in relation to" standard).  "[T]he jury could not have found that [Gill] used or carried a firearm 'in furtherance of' a drug trafficking offense without also implicitly finding that [Gill] used or carried a firearm 'during and in relation to' a drug trafficking offense."  United States v. Williams, 138 Fed. Appx. 743, 747 (6th Cir. 2005) (unpublished) (finding no constructive amendment when the defendants were charged

with using or carrying a firearm during and in relation to a drug trafficking offense, but the jury was instructed on possessing a firearm in furtherance of such an offense); see also Ceballos-Torres, 218 F.3d at 413 ("Because the carrying must be during drug trafficking, the carrying also furthers the trafficking by protecting the holder during that activity."). The misstatements in the jury instructions regarding the § 924(c) offense with which Gill was charged did not alter the "essential elements of the offense." Begnaud, 783 F.2d at 147 n.4. As such, we conclude the instructions did not constitute a constructive amendment of the indictment.

Having concluded the difference between the indictment and the instructions did not constitute a constructive amendment, we consider whether the discrepancies constitute plain error. See Fed. R. Crim. P. 52(b). We must determine whether there was plain error and whether any error "was so prejudicial as to have affected substantial rights resulting in a miscarriage of justice." United States v. Griffith, 301 F.3d 880, 883 (8th Cir. 2002) (quotation omitted). As the discussion above indicates, we find the instructions given were in error. In light of the clear language of Gamboa explaining the two different offenses encompassed in § 924(c), we conclude this error was plain. When instructing a jury about one of the two § 924(c) offenses, the district courts should clearly list the action and the standard of participation that the particular offense requires by tracking the applicable statutory language.

Although we conclude the instructions were in error, reversal is not required because the errors did not affect Gill's substantial rights. The instructions as a whole "adequately apprise[d] the jury of the essential elements of the offense[] charged and the burden of proof required of the government." Brown, 478 F.3d at 928. The language used, while not identical to the applicable statutory language, nonetheless imparted the necessary information to the jury. As discussed above, the instructions did not create a substantial risk that a jury could convict Gill of an offense other than the one with which he was charged. Cf. United States v. Savoires, 430 F.3d 376, 381 (6th Cir. 2005) (reversing a § 924(c) conviction because errors in the jury instructions

-26-

cast substantial doubt on whether the defendant was unanimously convicted of an offense criminalized under § 924(c)). Thus, the instructions did not affect Gill's substantial rights, and reversal is not required.

F.      Sufficiency of the Evidence

Gill challenges the sufficiency of the evidence supporting his conviction for carrying a firearm during and in relation to a drug trafficking offense. In considering the sufficiency of the evidence, "we view the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." United States v. Blazek, 431 F.3d 1104, 1107 (8th Cir. 2005) (alteration and quotation omitted). This is a "very strict standard of review." United States v. Cook, 356 F.3d 913, 917 (8th Cir. 2004).

As the United States Attorney admitted at oral argument, "No doubt this was a close call on the gun." Nonetheless, in light of the standard of review we employ, we conclude sufficient evidence supported Gill's conviction for carrying a firearm during and in relation to a drug trafficking crime. Based on the evidence presented at trial, a reasonable jury could find Gill carried the handgun Trooper Haas found in the black bag during and in relation to the offense of possessing marijuana with the intent to distribute it. Gill admitted that the gun was his and that he knew where it was located. The handgun was fully loaded, with a round in the chamber, and it was easily accessible to someone with knowledge of its location in the external pocket of the bag. The gun was not stored with Gill's other fugitive-apprehension supplies. The location of the gun, and the fact that it was loaded, undercuts Gill's assertion that the gun was possessed solely for the purpose of his duties as a fugitive apprehension agent. In addition, Gill testified that he was not planning on apprehending anyone until his return trip to California. In light of this evidence, a reasonable jury could decline to give credence to Gill's asserted exclusive purpose for the firearm. Moreover, the

-27-

sheer volume of the marijuana involved, estimated to be worth over $800,000, could make a reasonable jury conclude that Gill possessed the firearm in order to protect his illicit cargo. Agent Sikorski's testimony that drug traffickers often possess firearms to protect their illegal goods buttresses this common-sense conclusion.

Gill admitted to carrying the handgun. There was sufficient evidence of a nexus between the gun and the marijuana for a reasonable jury to conclude the handgun was carried during and in relation to the drug trafficking offense to which Gill pled guilty.

III.     Conclusion

The judgment of the district court is affirmed.

_____