# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1454

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Chris Coleman, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 22, 2009
Filed: October 30, 2009

_____

Before MELLOY, BEAM and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Chris Coleman was convicted after a jury trial of one count of conspiracy to distribute and possess with intent to distribute fifty grams or more of crack cocaine between December 1, 2006, and June 8, 2007, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, and 851 ("Count 1"), and one count of aiding and abetting the possession with intent to distribute five grams or more of crack cocaine on May 9, 2007, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2 ("Count 7").

The district court[1] denied Coleman's motion for judgment of acquittal and sentenced him to life in prison on Count 1 and a concurrent term of 480 months in prison on Count 7. Coleman appeals, arguing that the Government presented insufficient evidence to support a conviction on either count. He also argues that the district court abused its discretion by excluding the testimony of a proposed expert witness about the benefits that Coleman's co-conspirators could receive from cooperating with the Government. For the following reasons, we affirm.

## I.     BACKGROUND

On September 12, 2007, a federal grand jury returned a seven-count indictment charging Coleman and four other defendants with various drug offenses. David Hathaway, Cornelius Robinson, and Courtney Baker each pled guilty to one count of conspiracy to distribute crack and received sentences of 60, 104, and 120 months in prison, respectively. Gwendolyn Bates pled guilty to one count of distribution of crack and received a sentence of 60 months in prison. Coleman pled not guilty to Counts 1 and 7 and proceeded to trial.

In his plea agreement with the Government, Robinson agreed to testify against Coleman. Elmo Brown, who pled guilty to conspiracy to distribute crack in a separate case, also agreed to testify against Coleman. In an attempt to undermine the credibility of these witnesses, Coleman intended to call a former Assistant United States Attorney to testify as an expert about the sentencing reductions that Robinson and Brown could receive as a result of their cooperation with the Government. The district court found that this testimony would not assist the jury and granted the Government's motion in limine to exclude it.

---

[1]The Honorable Fernando J. Gaitan, Jr., Chief Judge, United States District Court for the Western District of Missouri.

At trial, Robinson testified that in 2006 and 2007 he lived with Bates at her house in Grandview, Missouri. While he lived with Bates, Robinson regularly obtained crack from Coleman for distribution. When Robinson owed Coleman money, he would allow Coleman to cook crack at Bates's house. Coleman "ran" the house when he cooked there and required customers to come inside to buy crack. As many as fifty customers per day bought crack at Bates's house. Robinson testified that he saw Coleman cook crack at least eighteen times and that Coleman cooked "no more than two, three, four ounces at a time." When Coleman suspected that the police were watching Bates's house, he moved the operation to a nearby duplex, where he continued to cook and distribute crack. Bates also sold crack for Coleman, and Coleman regularly discussed with Bates the amount of money she owed him in Robinson's presence.

Brown testified that he saw Coleman sell crack to Robinson and Bates for resale several times and that Coleman and Robinson frequently argued about "the money not being right." He also testified that as many as fifty customers came to Bates's house each weekend to buy crack. Finally, Brown testified that he saw Coleman cook crack on at least two occasions.

The Government also presented the testimony of two undercover police officers, Detectives Justin Rigot and Mark Corbin. Detective Rigot testified that he bought 6.79 grams of crack from Baker on December 29, 2006. A few days later, on January 2, 2007, Detective Rigot met Baker again and asked to purchase an ounce of crack. Rigot and Baker negotiated the sale while Rigot was sitting in a parked car in front of a residential home near the duplex. Coleman was standing in front of the home in the driveway approximately twenty feet away. Baker went back and forth between Coleman and Rigot several times attempting to finalize the sale. At trial, the Government played for the jury a recording Detective Rigot made of his conversation with Baker. The recording did not capture Baker's discussions with Coleman, but throughout his conversation with Detective Rigot, Baker claimed to be relaying

Coleman's concerns. Baker eventually told Rigot that Coleman refused to approve the sale because he suspected that Rigot was a police officer. Later that evening, however, Baker sold Rigot 5.87 grams of crack at a separate location.

Detective Corbin testified that he purchased 2.64 grams of crack from Bates on May 2, 2007. Corbin met Bates at her house and drove her to the duplex. He parked the car, gave Bates $200 in cash, and waited in the car while Bates went inside. Bates returned a short time later and handed Corbin a plastic bag containing several rocks of crack.

Detective Corbin also testified that he purchased 27.49 grams of crack from Robinson on May 9, 2007, in front of Bates's house. Corbin waited outside while Robinson retrieved the crack from the house. Robinson corroborated this testimony and added that Coleman personally supervised the May 9, 2007 sale. According to Robinson, Detective Corbin gave him $1800 in cash, which he took inside and handed to Coleman. Coleman did not have enough crack on hand to fill Corbin's order, so he sent Baker to buy the appropriate amount of crack from a different dealer. When Baker returned, Coleman took the crack and handed it to Robinson. Robinson then delivered the crack to Corbin.

At the close of the Government's case, Coleman moved for a judgment of acquittal, which the district court denied. The jury found Coleman guilty on Counts 1 and 7.

## II.    DISCUSSION

Coleman argues that the district court erred by denying his motion for judgment of acquittal because the evidence was insufficient to support a conviction on either Count 1 or Count 7. We review de novo challenges to the sufficiency of the evidence presented at trial. *United States v. Ironi*, 525 F.3d 683, 689-90 (8th Cir. 2008). In

conducting this review, we consider the evidence in the light most favorable to the jury's verdict and draw all reasonable inferences in the Government's favor. *United States v. McAtee*, 481 F.3d 1099, 1104 (8th Cir. 2007). We do not weigh the evidence or assess the credibility of witnesses, and we will reverse a conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Santana*, 524 F.3d 851, 853 (8th Cir. 2008).

To convict Coleman on Count 1, the Government was required to prove beyond a reasonable doubt that "two or more persons reached an agreement to distribute or possess with intent to distribute a controlled substance, that the defendant voluntarily and intentionally joined the agreement, and that at the time he joined the agreement, he knew its essential purpose." *United States v. Harris*, 493 F.3d 928, 931 (8th Cir. 2007), *cert. denied*, 552 U.S. ---, 128 S. Ct. 1263 (2008). The Government is not required to present direct evidence of an explicit agreement, and the jury may rely on circumstantial evidence to infer a "tacit understanding" among co-conspirators. *United States v. Jiminez*, 487 F.3d 1140, 1146 (8th Cir. 2007) (quoting *United States v. Cabrera*, 116 F.3d 1243, 1245 (8th Cir. 1997)).

In this case, the evidence showed that Coleman repeatedly provided crack to Robinson, Baker, Bates, and others for resale. This conduct alone provided a sufficient basis for the jury to infer that Coleman knowingly and intentionally joined an agreement to distribute crack. *See United States v. Ramirez*, 350 F.3d 780, 784 (8th Cir. 2003). Furthermore, Coleman was an active participant in the drug operation. Coleman cooked the crack and "ran" the house out of which it was sold. He supervised individual transactions and kept track of the money that his distributors owed him. Based on this evidence, a reasonable jury could find beyond a reasonable doubt that Coleman participated in a conspiracy to distribute crack cocaine.

Coleman also argues that the Government failed to prove that the conspiracy involved fifty grams or more of crack. We disagree. The Government presented

evidence that Detectives Rigot and Corbin obtained 42.79 grams of crack cocaine through controlled buys from Robinson, Baker, and Bates, all of whom were involved in the conspiracy with Coleman. A defendant is responsible for the drugs distributed by his co-conspirators if their sales were made "(1) in furtherance of the conspiracy and (2) were either known to [the defendant] or were reasonably foreseeable." *United States v. Foxx*, 544 F.3d 943, 953 (8th Cir. 2008), *cert. denied sub nom. Osborne v. United States*, 558 U.S. ---, No. 08-10424 (Oct. 5, 2009). Coleman regularly provided crack to Robinson, Baker, and Bates for resale. He supervised their distribution efforts and kept careful track of the money they owed him. A reasonable jury could infer from this evidence that the sales to Detectives Rigot and Corbin by Coleman's co-conspirators were made in furtherance of the conspiracy and were reasonably foreseeable to Coleman.

After establishing that the controlled buys were attributable to the conspiracy, the Government needed to present evidence that the conspiracy involved an additional 7.21 grams of crack cocaine to bring the total amount of crack involved in the conspiracy to at least fifty grams. The distribution efforts of Coleman and his co-conspirators attracted as many as fifty customers per day. Moreover, Robinson testified that he saw Coleman cook crack at least eighteen times and that Coleman cooked "no more than two, three, four ounces at a time."[2] A reasonable jury could easily infer from this evidence that the conspiracy involved at least 7.21 grams of crack cocaine in addition to the 42.79 grams that were sold to the undercover officers. Considered in the light most favorable to the verdict, a reasonable jury could find beyond a reasonable doubt that the conspiracy involved at least fifty grams of crack cocaine. Therefore, we conclude that the evidence was sufficient to support Coleman's conviction on Count 1.

---

[2]One ounce is equivalent to approximately 28.35 grams.

Coleman also argues that the evidence was insufficient to support his conviction on Count 7. Again, we disagree. To prove the crime of aiding and abetting the possession of drugs with intent to distribute, the Government must prove beyond a reasonable doubt "(1) that the defendant associated himself with the unlawful venture; (2) that he participated in it as something he wished to bring about; and (3) that he sought by his actions to make it succeed." *United States v. Rojas*, 356 F.3d 876, 878 (8th Cir. 2004) (quoting *United States v. McCracken*, 110 F.3d 535, 540 (8th Cir. 1997)). Robinson testified that Coleman personally supervised the sale of 27.49 grams of crack to Detective Corbin on May 9, 2007. Coleman took Detective Corbin's money from Robinson and sent Baker to obtain the amount of crack needed to fill Corbin's order. When Baker returned, Coleman handed the crack to Robinson, knowing that Robinson would distribute it by delivering it to Detective Corbin. Accordingly, the evidence of Coleman's participation in the May 9, 2007 sale was sufficient to support Coleman's conviction on Count 7.

Finally, Coleman argues that the district court abused its discretion by excluding the testimony of a proposed expert "about the potential benefits that Cornelius Robinson and Elmo Brown could receive as [a] result of their cooperation with the government." Appellant's Br. at 32. We review a district court's decision about the admissibility of expert testimony for abuse of discretion. *United States v. Anderson*, 446 F.3d 870, 874 (8th Cir. 2006).

In *United States v. Davis*, 457 F.3d 817 (8th Cir. 2006), we held that the district court did not abuse its discretion by refusing to allow a Federal Public Defender to testify as an expert about the "mechanics of the federal sentencing process" in order to undermine the credibility of the government's cooperating witnesses, *id.* at 824. We also noted in *Davis* that defense counsel's cross-examination, coupled with the district court's instructions, "sufficiently communicated to the jury the information it needed to assess the incentives government witnesses had to stretch or shade the truth

in order to obtain sentence reductions." *Id.* (quoting *United States v. French*, 12 F.3d 114, 117 (8th Cir. 1993)).

This case is very similar to *Davis*. Here, Coleman's attorney cross-examined both Robinson and Brown at length about their motivations for testifying against Coleman and the benefits that they expected to receive as a result of their cooperation with the Government. In addition, the district court instructed the jury that Robinson and Brown might receive sentencing reductions as a result of their cooperation and that it was the jury's responsibility to weigh the credibility of these witnesses. Armed with this information, the jury was equipped to evaluate the motivations of the Government's cooperating witnesses without the aid of additional testimony. In reaching this conclusion, we decline to address whether such testimony could ever assist a jury. We hold simply that the district court did not abuse its discretion by excluding the testimony of Coleman's proposed expert witness.[3]

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

_____

_____

[3]Coleman also argues that the district court violated his rights under the Due Process Clause of the Fifth Amendment and the Compulsory Process Clause of the Sixth Amendment because the district court did not allow him to show the bias of the Government's cooperating witnesses. This argument lacks merit. The proposed expert testimony was not the only method for Coleman to attack the credibility of the cooperating witnesses. As noted above, Coleman's attorney cross-examined both Robinson and Brown extensively about their motivations for testifying. Such vigorous cross-examination "is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). The district court's decision to exclude the testimony of Coleman's proposed expert did not preclude Coleman from demonstrating the potential bias of the Government's cooperating witnesses.