# United States Court of Appeals
### For the Eighth Circuit
_____

No. 21-3060
_____

United States of America

*Plaintiff - Appellee*

v.

David Leroy Allen

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: April 13, 2022
Filed: August 9, 2022
_____

Before COLLOTON, MELLOY, and GRUENDER, Circuit Judges.
_____

MELLOY, Circuit Judge.

David Leroy Allen was charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress

evidence obtained during a vehicle search. The district court[1] denied the motion. Mr. Allen proceeded to trial, where a jury found him guilty. He appeals and raises four arguments: (1) the district court should have granted his motion to suppress; (2) the district court should have admitted impeachment evidence; (3) the district court should have given additional jury instructions; and (4) the evidence was not sufficient to convict. We affirm.

I.

Just after midnight on November 28, 2019, Officer Brandon Holtan was patrolling alone in his usual patrol area, the fairgrounds neighborhood of Des Moines. Officer Holtan testified at the suppression hearing about his observations that evening and the inferences he drew from those observations. Based on his experience, Officer Holtan believed the fairgrounds neighborhood had a significant drug problem. He had received specific information that an individual was selling drugs out of a residence at 511 East 27th Street.

At approximately 12:48 a.m., Officer Holtan drove down East 27th Street and came to the residence at 511 East 27th Street. When Officer Holtan arrived, he saw a truck parked on the street in front of the house. Mr. Allen was standing outside the truck speaking to the driver. When Mr. Allen saw Officer Holtan, Mr. Allen "darted" away from the truck. Officer Holtan believed he had just observed a drug deal.

Mr. Allen entered the front passenger's side of an Altima parked in the driveway of the residence. The Altima was parked over the sidewalk, in violation of Iowa Code § 321.358 and Des Moines Code of Ordinances § 114-358. Brittney Pinckney sat in the driver's seat. Before Officer Holtan got out of his car, he observed Mr. Allen make "furtive" movements—Mr. Allen leaned forward at the

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

waist and reached down and to his left, towards the dashboard or the glove compartment in a way that Officer Holtan believed was consistent with hiding contraband.

Officer Holtan exited his vehicle and approached the passenger's side of the Altima. As he approached, Mr. Allen opened the door and held his hands up. Mr. Allen showed Officer Holtan a bottle of vodka and said that he had been drinking with his friends. As Officer Holtan spoke to Mr. Allen, three individuals exited the truck and approached the Altima. They told Officer Holtan they had been hanging out and drinking. Officer Holtan asked for each of their names. Officer Holtan recognized the driver's name as an individual suspected of selling drugs out of the residence. Officer Holtan told the three people who had been in the truck that they were free to leave. They then left.

After the truck passengers left, Mr. Allen asked if he could get out of the car. Officer Holtan thought this was suspicious because, during traffic stops, people normally stay in the vehicle until an officer directs them to exit. He thought that when people ask to exit the vehicle, it is a sign they are trying to distance themselves from something inside of it. Officer Holtan told Mr. Allen he could exit and instructed him to put his hands behind his back so Officer Holtan could handcuff him. As Officer Holtan was handcuffing Mr. Allen, he asked Mr. Allen and Ms. Pinckney what Mr. Allen had hidden under the seat. Mr. Allen stated that he had not hidden anything and that he had just been looking for his cigarettes. He was holding a pack of cigarettes when he was handcuffed. Mr. Allen asked Ms. Pinckney if she had called the police on him. Officer Holtan thought this question was suspicious because it is not something that people usually discuss while officers are present.

Officer Holtan escorted Mr. Allen to a police vehicle and told him he was being detained because of an open container violation. When Officer Holtan asked for Mr. Allen's name, Mr. Allen stated that Officer Holtan should know him from a recent

police raid at the residence. Mr. Allen also stated that he had case numbers in his pocket. Although Officer Holtan asked multiple times what was hidden in the car, Mr. Allen asserted he did not know about any contraband except the alcohol. Anything else in the vehicle, he said, belonged to Ms. Pinckney.

As Officer Holtan handcuffed Mr. Allen, Officer Jordan Ulin arrived. While Officer Holtan escorted Mr. Allen to one police vehicle, Officer Ulin escorted Ms. Pinckney to the other vehicle and spoke to her. Once they were secured in separate cars, Officers Holtan and Ulin began to search the Altima. Officer Holtan told Officer Ulin the Altima was parked over the sidewalk and there were open containers inside it. Officer Holtan informed Officer Ulin that "this house is a threat" and that Mr. Allen had been speaking to people inside the truck when he spotted Officer Holtan and "darted" back to the Altima. During this initial search, the officers found several bottles of alcohol, but they did not find any other contraband. Eventually, Officer Holtan asked Officer Ulin to keep searching while Officer Holtan went to speak with Ms. Pinckney. Specifically, Officer Holtan told him to keep looking for open containers and to make sure that he was only looking in spots where a "one-ounce shooter" could be hidden. Officer Holtan did not tell Officer Ulin to look for a weapon or evidence of a drug transaction.

Officer Holtan then went to speak with Ms. Pinckney. He told Ms. Pinckney that Mr. Allen had stated that any contraband in the car belonged to her. Ms. Pinckney then told Officer Holtan that there was a gun belonging to Mr. Allen in the car. She explained that Mr. Allen had gotten into a fight. Concerned for his safety, Mr. Allen asked Ms. Pinckney to drive him to the south side of Des Moines, where he picked up a gun. Mr. Allen had the gun when they arrived at the residence. When Mr. Allen saw Officer Holtan and returned to the Altima, he shuffled around because he was hiding the gun. Eventually, Ms. Pinckney explained that the gun was hidden behind a panel on the passenger's side wall of the dashboard.

With Ms. Pinckney's consent, Officer Holtan searched the Altima for a firearm. He found a gun exactly where Ms. Pinckney stated it would be, along with a plastic container of ammunition. The gun was positioned so that the barrel was pointed toward the driver's side of the vehicle. Officer Holtan believed that this position was consistent with how the gun would be arranged if a person in the passenger's seat held it by the grip and placed it in the compartment.

Officer Holtan returned to his vehicle to speak to Mr. Allen. After Officer Holtan read Mr. Allen his <u>Miranda</u>[2] rights, Mr. Allen stated that the gun was not his but that he should have one because he was scared for his life. Mr. Allen told Officer Holtan the gun "was there to protect me but it wasn't mine." Eventually, Mr. Allen decided he was willing to speak to Officer Holtan but he was not willing to do so in front of the residence. Officer Holtan drove Mr. Allen to another location and they spoke further. Mr. Allen stated that the gun "wasn't mine but I wanted to protect myself," that he "had brought it," and that he "knew about it."

Several hours later, at approximately 4:30 in the morning, Investigator Brian Buck interviewed Mr. Allen. Mr. Allen told Investigator Buck that Ms. Pinckney had handed him the gun as he got into the car, and he hid it for her. He admitted he had touched the gun and his DNA would be on it.

II.

Mr. Allen first argues that the district court erred because it denied his motion to suppress the firearm. Mr. Allen argues that the officers impermissibly extended the traffic stop by searching the inside of the car without probable cause.

---

[2]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A.

In an appeal from a denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Davis, 943 F.3d 1129, 1132 (8th Cir. 2019).

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. A search of a vehicle may violate a passenger's Fourth Amendment rights if an unreasonable seizure of the passenger caused the search. Davis, 943 F.3d at 1132. A traffic stop is a reasonable seizure if it is "supported by either reasonable suspicion or probable cause." United States v. Soderman, 983 F.3d 369, 374 (8th Cir. 2020). Once a vehicle is stopped based on reasonable suspicion or probable cause, officers may continue the stop only for the time necessary "to attend to the stop's 'mission' and 'related safety concerns.'" Id. (quoting Rodriguez v. United States, 575 U.S. 348, 354 (2015)). Thus, officers may continue the stop while they complete tasks related to the stop, such as checking the vehicle's registration and insurance, checking the occupants' names and criminal histories, preparing the citation, and asking routine questions. United States v. Murillo-Salgado, 854 F.3d 407, 415 (8th Cir. 2017).

Generally, a valid traffic stop becomes an unreasonable seizure if the officers extend the stop beyond the time necessary to complete the stop's mission. Soderman, 983 F.3d at 374. The officers may, however, extend the stop if they develop reasonable suspicion of criminal activity. Davis, 943 F.3d at 1132. "The reasonable suspicion inquiry asks 'whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'" United States v. Sanchez, 955 F.3d 669, 674 (8th Cir. 2020) (quoting United States v. Walker, 771 F.3d 449, 450 (8th Cir. 2014)). To have reasonable suspicion, a "'police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' further investigation." United States v. Woods, 829 F.3d 675, 679 (8th Cir. 2016) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)). We

review the totality of the circumstances to determine if an officer had reasonable suspicion to extend a traffic stop. Davis, 943 F.3d at 1132.

## B.

Officer Holtan had probable cause to stop the Altima because it was illegally parked. Because the initial stop was permissible, two questions remain: first, whether Officer Holtan extended the search of the vehicle beyond the time necessary "to attend to the stop's 'mission' and 'related safety concerns,'" and second, if he did, whether the extension was supported by reasonable suspicion of criminal activity.

First, Officer Holtan extended the stop. The stop was for a parking violation, and all the evidence of the violation was outside the car. Cf. Knowles v. Iowa, 525 U.S. 113, 118 (1998) (holding that when an officer cited a driver for speeding, the need to find evidence did not justify a search of a car because the officer had already obtained all the evidence necessary to prosecute the offense and no more evidence would be found in the car). Once Officer Holtan observed the location of the Altima on the sidewalk, he had gathered all the evidence he needed to prosecute a parking violation. The remaining investigation would involve checking the car's license and registration, checking Ms. Pinckney's and Mr. Allen's identification and criminal histories, and writing the citation. See Murillo-Salgado, 854 F.3d at 415. It would not involve a search of the interior of the car. By proceeding with a search, instead of completing the investigation and citation, Officer Holtan extended the traffic stop beyond the time necessary to complete the stop's mission.

As to the second question, we find Officer Holtan had reasonable suspicion to extend the traffic stop. When Officer Holtan decided to extend the stop by searching the Altima, he could point to specific and articulable facts which warranted further investigation. At 12:48 a.m., in front of a house that was suspected to be the location of drug dealing, Officer Holtan had observed Mr. Allen standing outside an occupied truck. Officer Holtan eventually learned that the truck's driver was a suspected drug

dealer. When Mr. Allen saw a police officer, he rushed back to his own car and appeared to hide something in an area of the car where offenders often hide contraband. When Officer Holtan approached, Mr. Allen quickly admitted to possessing alcohol and attempted to distance himself from the inside of the car. In Officer Holtan's presence, Mr. Allen asked Ms. Pinckney if she had called the police on him. Mr. Allen told Officer Holtan that he had case numbers in his pocket and that Officer Holtan should know him from a recent police raid at the same residence. Considering the totality of the circumstances, including the location, the time of night, the presence of a suspected drug dealer, and Mr. Allen's decision to rush back to his car and hide something, Officer Holtan had reasonable suspicion to think he had observed a drug deal and Mr. Allen had concealed contraband or a weapon. Based on his reasonable suspicion, Officer Holtan could extend his traffic stop to search for the hidden contraband and to speak to Ms. Pinckney. The district court appropriately denied the motion to suppress.

III.

Mr. Allen next argues the district court erred because it excluded defense Exhibits S and T from evidence. Both exhibits are videos depicting Ms. Pinckney's interactions with Officer Ulin. Defense Exhibit S is a video of Ms. Pinckney looking for her keys and saying she was very grateful that she was not being arrested. Defense Exhibit T is a video in which Officer Ulin told Ms. Pinckney she was barred from driving. Mr. Allen argues that these exhibits were admissible to impeach Ms. Pinckney's credibility under Federal Rule of Evidence 806 because they show her motive to lie and place blame for the gun on Mr. Allen. The government argues that the videos were not admissible to impeach Ms. Pinckney because she did not testify at trial and the court did not admit any of her hearsay statements.

"We review the evidentiary rulings of a district court only for abuses of discretion, and will reverse only when an improper evidentiary ruling affects the substantial rights of the defendant or when we believe that the error has had more

-8-

than a slight influence on the verdict." <u>United States v. Yarrington</u>, 634 F.3d 440, 447 (8th Cir. 2011) (quoting <u>United States v. Elbert</u>, 561 F.3d 771, 775 (8th Cir. 2009)). Under Federal Rule of Evidence 806, when hearsay statements are admitted, a party may impeach the credibility of the person who made those statements "by any evidence that would be admissible for [impeachment] purposes if the declarant had testified as a witness." Fed. R. Evid. 806.

Any error in excluding the defense exhibits was harmless and did not affect Mr. Allen's substantial rights because the impeachment information was admitted through Officer Ulin's testimony. Officer Ulin testified that Ms. Pinckney was barred from driving. He also testified that Ms. Pinckney exhibited some of the signs of intoxication, including slurred speech, and that the officers found multiple open containers of alcohol in her car. Defense counsel raised this information in closing arguments. Specifically, counsel noted that Ms. Pinckney was not cited for any of the violations she may have committed, including driving while barred, operating while intoxicated, parking illegally, or possessing open containers in a vehicle. Counsel also argued that Ms. Pinckney could have been responsible for the firearm. Because the impeachment information was admitted at trial, and counsel was permitted to make arguments based on it, any error in excluding Exhibits S and T was harmless.

## IV.

Mr. Allen next argues that the district court erred because it refused to give his proffered jury instructions. Final Instruction 9 explained the elements of the crime of felon in possession of a firearm. The instruction explained that, to convict, the government was required to prove that Mr. Allen knowingly possessed a firearm. Final Instruction 11 defined the element of possession, and explained that possession may be actual or constructive, sole or joint. The court also gave Final Instruction 10, which explained what evidence the jury could consider to decide if the government has proven the knowledge element. It explained that "knowledge may be proved like anything else."

In addition to the instructions given, Mr. Allen argues the district court should have given three additional instructions. First, he argues that the court should have given a separate instruction on "innocent or transitory" possession of a firearm. Second, he argues that the court should have added language to Final Instruction 11 to explain "accidental" possession of a firearm. Third, he argues the court should have included the definition of "knowingly" in Final Instruction 10.

We review a district court's rejection of a proposed jury instruction for abuse of discretion. United States v. Bull, 8 F.4th 762, 769 (8th Cir. 2021). A defendant is entitled to a theory-of-defense jury instruction if the "instruction is supported by the evidence" and "correctly states the law." Id. (quoting United States v. Overton, 971 F.3d 756, 767 (8th Cir. 2020). "A defendant is not entitled to a particularly worded instruction as long as the instructions fairly and adequately instruct the jurors on the applicable law." United States v. Gilmore, 968 F.3d 883, 886 (8th Cir. 2020).

Mr. Allen first requested an instruction on "innocent or transitory" possession. This Court has held there is no innocent or transitory possession defense to a felon in possession of a firearm charge. United States v. Becerra, 958 F.3d 725, 730–31 (8th Cir. 2020) ("Knowing possession, regardless of motive, is all that matters."). Mr. Allen argues that Becerra was wrongly decided in light of the Supreme Court's decision in Rehaif v. United States, 139 S. Ct. 2191 (2019). We disagree. Rehaif held that, to sustain a conviction under 18 U.S.C. § 922(g), the defendant must know both of his possession of the firearm and of his status as a prohibited person. Id. at 2194. Becerra is consistent with that decision because it recognizes possession of the firearm must be knowing. Becerra, 958 F.3d at 730–31. Mr. Allen's proffered jury instruction is an incorrect statement of the law. Therefore, the district court did not abuse its discretion by rejecting Mr. Allen's "innocent or transitory" possession instruction.

Second, Mr. Allen asked the district court to add the following language to its instruction on possession:

Knowledge is required to establish constructive possession. Constructive possession requires knowledge of presence plus control.

Constructive possession is not established where the government fails to establish some nexus between a defendant and the contraband; mere physical proximity to a weapon is insufficient. Mere presence as a passenger in a car from which the police recover a weapon does not establish possession.

Mr. Allen's proposed instruction closely mirrors the defendant's proposed answer to a jury question in Gilmore, 968 F.3d at 886. The requested instruction is a correct statement of law—constructive possession requires both knowledge of contraband and the intent to control it. Id. But these elements are already explained in Final Instruction 11. That instruction stated a person who "has both the power and the intention at a given time to exercise dominion or control over a thing . . . is then in constructive possession of it." Final Instruction 11 fairly and adequately explains constructive possession. See Gilmore, 968 F.3d at 886. The district court did not abuse its discretion by rejecting Mr. Allen's additional language.

Third, Mr. Allen asked the district court to give the jury an instruction on the definition of the word "knowingly." Mr. Allen requested an instruction that stated, "An act or a failure to act is knowingly done if done voluntarily and intentionally, and not because of mistake or accident or some other innocent reason."

Generally, jurors do not need a definition of "knowingly" because it is within the common understanding of a lay person. United States v. Counce, 445 F.3d 1016, 1019 (8th Cir. 2006); United States v. Urick, 431 F.3d 300, 304 (8th Cir. 2005). A definition instruction, however, may be appropriate if "the proposed instruction is

required for a fair determination of the defendant's guilt or innocence." United States v. Brown, 33 F.3d 1014, 1017 (8th Cir. 1994).

Here, the district court did not abuse its discretion in finding that a definition was not necessary for a fair determination of Mr. Allen's guilt or innocence. Final Instruction 9 explained that the government was required to prove that Mr. Allen possessed the firearm knowingly. Based on that instruction, defense counsel argued that Mr. Allen did not knowingly possess the firearm because he did "not have the awareness and the intent to possess [the] gun." Counsel argued that if Ms. Pinckney quickly passed him the gun when he got into the Altima, his possession could be a mistake or accident and not intentional and, therefore, not knowing possession. Because Mr. Allen was able to present his theory of defense, an instruction on the definition of "knowingly" was not necessary for a fair determination of his guilt or innocence.

The district court did not abuse its discretion by rejecting Mr. Allen's proposed jury instructions.

V.

Finally, Mr. Allen argues the evidence was insufficient to support a guilty verdict. We review the sufficiency of the evidence "de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Morrissey, 895 F.3d 541, 549 (8th Cir. 2018) (quoting United States v. Mathews, 761 F.3d 891, 893 (8th Cir. 2014)). We will reverse a conviction "only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." Id. (quoting United States v. Coleman, 584 F.3d 1121, 1125 (8th Cir. 2009)).

The evidence was sufficient to support Mr. Allen's conviction. The only issue in this trial was whether Mr. Allen knowingly possessed the firearm. When Officer

-12-

Holtan arrived on scene, he observed Mr. Allen leaning down and moving like he was hiding something. Officer Holtan ultimately found the firearm behind a panel on the passenger's side of the vehicle, where Mr. Allen had been sitting. The firearm was positioned so the grip was pointing toward a person in the passenger's seat, as it would have been if placed there by the passenger. When speaking in Officer Holtan's car at the scene, Mr. Allen stated that the gun "was there to protect me." He later told Officer Holtan that he "had brought it," and that he "knew about it." Ultimately, Mr. Allen told Investigator Buck that he had touched the firearm and he expected his DNA would be on it. Considering the location of the firearm and Mr. Allen's statements, the evidence showed that Mr. Allen knew of the gun and exercised control over it. Whether or not Ms. Pinckney also had control of the gun, the evidence was sufficient to show that Mr. Allen at least had joint possession of it.

## VI.

The district court correctly denied Mr. Allen's motion to suppress because the search was supported by reasonable suspicion. At trial, any error in excluding defense Exhibits S and T was harmless because the impeachment information was admitted through Officer Ulin's testimony. The district court did not abuse its discretion by rejecting Mr. Allen's proposed jury instructions because the instructions it gave fairly and accurately set forth the law. Finally, the evidence was sufficient to support Mr. Allen's conviction.

We affirm the judgment of the district court.

_____